**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **COLLETTE L. FLANAGAN and** | § | |
| **RONDERALINE S. ALLEN,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **CASE NO. 3:13-CV-4231-M-BK** |
| | § | |
| **CITY OF DALLAS, TEXAS and** | § | |
| **CLARK STALLER,** | § | |
| | § | |
| **Defendants.** | § | |

**FINDINGS, CONCLUSIONS AND RECOMMENDATION**

This case has been referred to the undersigned for pretrial management. (Doc. 28). The cause is now before the Court for a recommendation on Defendant City of Dallas's *Motion Pursuant to Rule 12(b)(6) to Dismiss the Plaintiffs' Federal Claims*. (Doc. 19). For the reasons that follow, the Court recommends that the motion be **GRANTED IN PART**.

## I.     BACKGROUND

Plaintiffs' state and federal constitutional claims against Defendant City of Dallas ("the City") arise out of the shooting death of Clinton Allen, Plaintiffs' child, during a struggle with Dallas Police Department ("DPD") Officer Clark Staller. Plaintiffs allege in their first amended complaint that on the day of the incident in March 2013, Allen had been visiting Mandria Kelly at her apartment and made plans to return later. (Doc. 15 at 4). After Allen left the residence and then returned, Kelly became upset and called 911 at 12:26 a.m. to report that "someone was knocking on my door that wouldn't leave," that she had two children in the house, and that the man was not armed. (Doc. 15 at 4; Doc. 15-1 at 3). Plaintiffs assert, and attach to their amended complaint, Kelly's supporting statement that Officer Staller arrived at the apartment

complex and before Kelly gave him any information or a description of Allen, Staller saw an unidentified person walking towards the parking lot, at which point he initiated a foot pursuit, and Kelly heard gunshots 30 seconds later.  (Doc. 15 at 4; Doc. 15-1 at 2-3).  Plaintiffs allege that Officer Staller had no probable cause or reasonable suspicion to believe that Allen was committing or had committed a crime and when Officer Staller arrived, Allen was attempting to leave.  (Doc. 15 at 5).  Plaintiffs additionally note that the DPD "shooting summary" states that after Officer Staller gave Allen verbal commands, Allen complied, and Officer Staller holstered his weapon and drew a taser.  (Doc. 15 at 11).  At some point during their confrontation, Officer Staller used the taser on Allen and then shot him.  (Doc. 15 at 10).

Plaintiffs additionally attach to their amended complaint the eyewitness statement of Vickie McKnight-Simpson, who states that Officer Staller told Allen to raise his hands several times, Allen complied and did not act aggressively or fight, but Officer Staller started shooting him repeatedly from several feet away while Officer Staller was backing up.  (Doc. 15 at 5; Doc. 15-2 at 2).  McKnight-Simpson avers that she overheard Officer Staller tell another officer that he "had to unload and reload another clip." (Doc. 15-2 at 2).  Plaintiffs claim that according to McKnight-Simpson and other witnesses, Allen was complying with Officer Staller's instructions by walking towards him with his hands visible, but Officer Staller nevertheless shot him seven times even though Officer Staller was not in any danger, and Allen had done nothing to cause Officer Staller to fear for his life.  (Doc. 15 at 5-6).  Plaintiffs aver that there were no signs of visible injuries or bruises to Defendant Staller's body to suggest that the use of deadly force was justified.  (Doc. 15 at 11).

Plaintiffs list several instances of Officer Staller's misconduct and complaints against him and contend that the City, the DPD, and DPD Police Chief David Brown knew of Officer

Staller's prior misbehavior and lack of training but did nothing to protect Allen and others. (Doc. 15 at 7).  Plaintiffs assert that the City and the DPD have a longstanding record of not providing DPD officers with adequate training and not preventing excessive force and extrajudicial killings by DPD officers.  (Doc. 15 at 7).   Plaintiffs aver that Dallas City Councilman Dwaine Caraway recently confirmed that the City Council and the City delegated policymaking authority for officer training to Chief Brown, and Chief Brown admitted that there is a need for additional officer training.  (Doc. 15 at 7-8).  Plaintiffs assert that the lack of officer training has resulted in (1) numerous unarmed citizens, particularly minorities, being killed or injured by DPD officers; (2) Dallas being ranked second in the nation in police misconduct incidents; and (3) numerous grand jury investigations and DPD internal affairs investigations. (Doc. 15 at 8).

Plaintiffs allege in the first count of their complaint, under the heading "Excessive Force" that Officer Staller unreasonably used excessive force against Allen pursuant to the customs and policies of the DPD regarding the use of deadly force as authorized and/or ratified by Chief Brown.  (Doc. 15 at 14).  In Count II, under the heading "Racial Profiling," Plaintiffs allege that the DPD has official customs, policies, and practices authorized and/or ratified by Chief Brown to treat African-Americans cruelly and use deadly force regardless of the circumstances, and Officer Staller acted pursuant to such customs and treated Allen in the manner that he did because Allen was black.  (Doc. 15 at 14-15).  In Count III, under the heading "Failure to Train," and elsewhere in their complaint, Plaintiffs allege that the City deprived Allen of his Fourth and Fourteenth Amendment rights by failing to provide proper training to DPD officers in the use of deadly force and foot pursuits.  (Doc. 15 at 1, 3, 15-16, 18).  They assert that the City's failure to adequately train its employees in these areas reflects a deliberate indifference by the City and

Chief Brown to the rights of the City's inhabitants.  (Doc. 15 at 16).  In short, Plaintiffs assert

that the actual practice or custom of the DPD is to "shoot first and ask questions later."  (Doc. 15

at 16).  Plaintiffs conclude that the City's failure to properly train DPD officers under Chief

Brown's authority was the proximate cause of Allen's death.  (Doc. 15 at 18).  The City has now

moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).[1]  (Doc. 19).

## II.     APPLICABLE LAW

A plaintiff fails to state a claim for relief under Rule 12(b)(6) when the complaint does

not contain "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v.*

*Twombly,* 550 U.S. 544, 570 (2007).  In order to overcome a Rule 12(b)(6) motion, a plaintiff's

complaint should "contain either direct allegations on every material point necessary to sustain a

recovery . . . or contain allegations from which an inference may fairly be drawn that evidence

on these material points will be introduced at trial."  *Campbell v. City of San Antonio,* 43 F.3d

973, 975 (5th Cir. 1995) (quotation omitted).  The complaint should not simply contain

conclusory allegations, but must be pled with a certain level of factual specificity, and the district

court cannot "accept as true conclusory allegations or unwarranted deductions of fact."  *Collins*

*v. Morgan Stanley Dean Witter,* 224 F.3d 496, 498 (5th Cir. 2000) (quotation omitted).  When

considering a Rule 12(b)(6) motion, a court may consider documents outside the complaint when

they are: (1) attached to the motion to dismiss; (2) referenced in the complaint; and (3) central to

the plaintiff's claims.  *In re Katrina Canal Breaches Litig.,* 495 F.3d 191, 205 (5th Cir. 2007).

---

[1] Plaintiffs also have sued the City for false arrest and negligent failure to train and discipline, (Doc. 15 at 19-21), but the City has not moved to dismiss those counts.  Additionally, although Plaintiffs also contended in their amended complaint that the City failed to train DPD officers in how to properly conduct foot pursuits, (Doc. 15 at 16, 18), the City has not moved to dismiss that aspect of their complaint either, so the DPD's foot pursuit policy or lack thereof, will not be discussed further.

Section 1983 "provides a federal cause of action for the deprivation, under color of law, of a citizen's 'rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994). To state a claim under section 1983, Plaintiff must allege facts that show that he has been deprived of a right secured by the Constitution and the laws of the United States, and the defendants were acting under color of state law. *See Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978). When an individual sues a municipality, he can provide fair notice to the defendant as needed to survive a motion to dismiss by, *inter alia*, describing (1) past incidents of misconduct by the defendant to others; (2) multiple harms that occurred to the plaintiff himself; (3) the involvement of multiple officials in the misconduct; or (4) the specific topic of the challenged policy or training inadequacy. *Thomas v. City of Galveston*, 800 F.Supp.2d 826, 843-44 (S.D. Tex. 2011) (citing cases involving failure to train). Those types of details, together with any additional elaboration possible, help to (1) "satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests," *Twombly*, 550 U.S. at 555 n.3; and (2) "permit the court to infer more than the mere possibility of misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

## III.   ARGUMENTS AND ANALYSIS

### A.  *Fourteenth Amendment Violations*

As an initial matter, the Court must determine the proper rubric under which Plaintiffs' claims are analyzed. The City states in its dismissal motion that it "does not understand Plaintiffs to plead deprivation of rights protected by the Fourteenth Amendment," but to the extent Plaintiffs do, any such claims fail because the Fourth Amendment controls. (Doc. 19 at 23-24). Plaintiffs counter that they have pleaded valid Fourteenth Amendment claims because

they allege in Counts II and III of their amended complaint, respectively, that (1) Officer Staller acted pursuant to the City's customs and policies which permit racial profiling of African-American suspects in violation of the Equal Protection Clause; and (2) the City failed to properly train its officers in using deadly force, and the right to be free from state-caused damage to a person's bodily integrity is protected by the Fourteenth Amendment's due process clause.  (Doc. 24 at 10-12).

The City replies that Plaintiffs' Fourteenth Amendment claim based on its alleged policy of racial profiling fails because Plaintiffs did not allege that non-African-Americans were treated differently than Allen was treated.  (Doc. 27 at 3-4).  Further, the City argues that when a person is harmed in the course of a seizure, as Allen was here, the Fourth Amendment applies, not the Fourteenth Amendment.  (Doc. 27 at 4-5).

"Selectivity in the enforcement of criminal laws is subject to constitutional restraints," and the rubric for analyzing a racial profiling claim thus draws on "ordinary equal protection standards."  *Wayte v. United States*, 407 U.S. 598, 608 (1985).  To state a claim of racial profiling under the Equal Protection Clause and section 1983, a plaintiff must allege that he was treated differently than similarly situated individuals and that the unequal treatment stemmed from a discriminatory intent.  *Bowlby v. City of Aberdeen*, 681 F.3d 215, 227 (5th Cir. 2012). When a plaintiff is injured while being arrested, the Fourth Amendment governs.  *Graham v. Connor*, 490 U.S. 386, 395 (1989) (holding that when an excessive force claim arises in the context of an arrest, "all claims that law enforcement officers have use excessive force – deadly or not – in the course of an arrest . . . should be analyzed under the Fourth Amendment" rather than under a due process approach).

A review of Plaintiffs' amended complaint reveals that their racial profiling claim does not contain any allegation that Allen was treated differently than similarly-situated non-African-Americans.  (Doc. 15 at 14-15) (alleging that "Defendant Staller treated Allen in the manner he did because he was black.  The poor treatment of African Americans by the DPD, mainly Defendant Staller, is a well known fact in Dallas.").  Accordingly, they have failed to state a claim, and their racial profiling claim should be dismissed.  *Bowlby*, 681 F.3d at 227.  However, it is recommended that Plaintiffs be granted leave to amend their complaint a final time to allow them the opportunity, if desired, to re-allege their racial profiling claim against the City.

A failure to train claim must be based on an underlying constitutional violation.  *Whitley v. Hanna*, 726 F.3d 631, 648 (5th Cir. 2013), *cert. denied*, 134 S.Ct. 1935 (2014). As alleged in Plaintiffs' amended complaint, their failure to train claim is ultimately based on Officer Staller's use of deadly force during his seizure of Allen.  Because Allen was killed by the use of deadly force in the course of being seized, the Fourth Amendment governs.  *Graham*, 490 U.S. at 395. Plaintiffs' authority is inapposite.  *See Canton*, 489 U.S. at 381, 388 (denial of medical treatment to a pretrial detainee stemming from a failure to train invoked the Fourteenth Amendment).  Thus, to the extent Plaintiffs plead a cause of action under the Fourteenth Amendment for failure to train in relation to the use of deadly force, it should be dismissed with prejudice.  *See Tennessee v. Garner*, 471 U.S. 1, 7 (1985) ("[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment.").  Accordingly, Plaintiffs' failure to train claim, as well as his excessive force claim, next will be considered under the Fourth Amendment rubric.

### B. Excessive Force

A city does not automatically incur section 1983 liability for injuries caused solely by its employees, and it cannot be held liable under section 1983 on a *respondeat superior* theory. *Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658, 691, 694 (1978); *Johnson v. Deep East Tex. Reg'l Narcotics*, 379 F.3d 293, 308 (5th Cir. 2004). Moreover, a municipality is almost never liable for an isolated unconstitutional act on the part of an employee. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). Rather, to establish municipal liability under section 1983 requires proof of three elements: (1) a policymaker; (2) an official policy; and (3) a violation of constitutional rights whose "moving force" is the policy or custom. *Monell*, 436 U.S. at 694.

The identification of those officials whose decisions represent the official policy of a local governmental unit is a question of state law to be resolved by the trial judge. *Worsham v. City of Pasadena*, 881 F.2d 1336, 1343 (5th Cir. 1989). Unconstitutional policy is attributable to the governing body of a city where the policy was made by an official to whom the governing body gave policymaking authority. *Bennett v. City of Slidell*, 728 F.2d at 768 (5th Cir. 1984) (*en banc*). A lawmaking officer is one who has "final authority to establish municipal policy with respect to the . . . subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 483 (1986). "Policymakers act in the place of the governing body in the area of their responsibility; they are not supervised except as to the totality of their performance." *Bennett*, 728 F.2d at 769. The governing body retains financial control and final legal control by which it may limit or revoke the authority of the official. *Id.* The relinquishment of policymaking authority and supervision by the governing body is much more likely to exist, by necessity, as the size and complexity of the government increase. *Id.* The governing body may delegate

policymaking authority either expressly or it may, by conduct or practice, acknowledge the delegee's status as a policymaker. *Id.* Either way, the delegation of such authority requires more than a showing of mere discretion or decisionmaking authority on the delegee's part. *Id.*

A policy or custom can be either (1) a policy statement or rule that is officially promulgated by the county's lawmaking officers or a delegated official; or (2) a persistent, widespread practice of county officials or employees, which is so common and well settled as to constitute a custom that fairly represents county policy. *Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984); *see also Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (noting that a policy can develop "by acquiescence in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity."); *Webster v. City of Houston*, 735 F.2d 838, 842 (5th Cir. 1984) (stating that if the actions of city employees are to be used to prove a custom for which the municipality can be held liable, "those actions must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees.").

For a municipality to be liable based on its policy, a plaintiff must show either (1) that the policy itself violated federal law or authorized or directed the deprivation of federal rights; or (2) "that the policy was adopted or maintained by the municipality's policymakers with 'deliberate indifference' as to its known or obvious consequences . . . A showing of simple or even heightened negligence will not suffice." *Johnson*, 379 F.3d at 309 (quotation omitted). The latter showing "generally requires that a plaintiff demonstrate at least a pattern of similar violations." *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003). Indeed, in describing "custom," the Supreme Court has used such phrases as "persistent and widespread . . .

practices," "systematic maladministration" of the laws, practices that are "permanent and well settled," and "deeply embedded traditional ways of carrying out . . . policy." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970). Where the violations are flagrant or severe, the fact finder may require a shorter pattern of the conduct to show that diligent governing body members would necessarily have learned of the objectionable practice and agreed to its continuation. *Bennett I*, 728 F.2d at 768.

Actual or constructive knowledge of the unconstitutional custom also must be attributable to the county's governing body or to the official to whom policy-making authority has been delegated. *Johnson*, 379 F.3d at 309. Actual knowledge can be shown by such means as the topic being discussed at city council meetings. *Bennett I*, 728 F.2d at 768. "Constructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities, as for example, where the violations were so persistent and widespread that they were the subject of prolonged public discussion or of a high degree of publicity." *Id.* Finally, Plaintiffs must establish that the policy at issue was the moving force behind the constitutional violation. *Monell*, 436 U.S. at 694. In other words, Plaintiffs must show a direct causal link between the policy and the violation. *Piotrowski*, 237 F.3d at 580; *see also Johnson*, 379 F.3d at 310 (there "must be more than a mere 'but for' coupling between cause and effect"; the policy "must be closely related to the ultimate injury" and have "actually caused" the constitutional violation complained of).

### 1. *Chief of Police as City's Final Policymaker*

The City argues that Plaintiffs' section 1983 claims against it must be dismissed because they erroneously plead that Chief Brown is the City's final policymaker with respect to DPD officer training when, as a matter of established law, the City's final policymaker is the Dallas

City Council.  (Doc. 19 at 13-16).  The City also contends that Plaintiffs fail to plead any non-conclusory facts or point to any Council action that would allow a reasonable inference that the Council delegated to Chief Brown the policymaking authority it possesses.  (Doc. 19 at 16).  Thus, the City argues, Chief Brown's actions and decisions do not constitute official policy which may affix section 1983 liability to the City.  (Doc. 19 at 15, 17).

Plaintiffs assert that they identified Chief Brown as the City's final policymaker with respect to the DPD, and the City's cases to the contrary are inapposite because they were decided at the summary judgment stage by which point evidence on the subject had been adduced.  (Doc. 24 at 12-13).  The City replies that it is properly relying on case law which demonstrates that Chief Brown is not DPD's policymaker.  (Doc. 27 at 1-2) (citing *Jett*, 491 U.S. at 737) (holding that the trial court should refer to state and local positive law, as well as custom having the force of law, to identify those officials who have final policymaking authority for a government entity).

A sufficient complaint must provide adequate "factual content" to make deliberate indifference by the City's official policymakers not merely conceivable, but plausible in the context of the facts alleged.  *See Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").  Chapter III of the Dallas City Charter provides that all powers conferred on the City, unless provided otherwise, are exercised by the Dallas City Council.  DALLAS CITY CHARTER, ch. III, § 1.  The Charter specifies that the City Council appoints the City Manager, who is responsible for the proper administration of all City affairs and is subject to the Council's supervision.  *Id.* at ch. VI, §§1, 2.  The Charter further provides that the Chief of Police has "control of the police

department, subject to the supervision of the city manager, and also subject to such rules, regulations, and orders as the city manager may prescribe." *Id.* at ch. XII, § 2(1).  As plainly written, the Chief of Police's managerial decisions and policies are subject to review by the City Manager who, in turn, is subject to the City Council's supervision.

At least two courts in this district have relied on the plain language of the City Charter to find that the Dallas Chief of Police is not a policymaker for purposes of section 1983 liability. *See Guzman v. City of Dallas*, No. 09-cv-2426-B-BD, 2010 WL 4514369, *3 (N.D. Tex. 2010) (Kaplan, J.) (recommending dismissal of a claim against the City of Dallas based on a finding that the Chief of Police is not the City's final policymaker for the DPD), *adopted by* 2010 WL 4514364 (N.D. Tex. 2010) (Boyle, J.); *Mosser v. Haney*, No. 03-CV-2260-B, 2005 WL 1421440, *4 (N.D. Tex. 2005) (Boyle, J.) (rejecting the plaintiff's contention that the Chief of Police was a final policymaker for the DPD); *see also Curtis v. Arapaho Venture Ltd.*, No. 03-CV-2099-H, 2004 WL 2248236, *3 (N.D. Tex. 2004) (Sanders, J.) (determining that "the Dallas City Council retains final authority for promulgating all police regulations and does not delegate policymaking authority to the Chief of Police").  Plaintiffs aver in their amended complaint, however, that Dallas City Councilman Dwaine Caraway recently confirmed that the City Council had delegated policy-making authority for police officer training to Chief Brown.  (Doc. 15 at 7).

The City charges that this contention is conclusory.  (Doc. 19 at 16).  In analyzing a complaint, the Court must accept all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.  *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999).  Nevertheless, "conclusory allegations will not suffice to prevent a motion to dismiss, and neither will unwarranted deductions of fact."  *U.S. ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 379 (5th Cir. 2003) (alteration, citation, and internal quotation marks omitted).  Rather,

"[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." _Twombly, 550 U.S. at 555_ (citations and footnote omitted).  Upon consideration, the undersigned does not find that Plaintiffs' allegation regarding Councilman Caraway's statement is so conclusory that it cannot support Plaintiffs' allegation that the City has delegated to Chief Brown policymaking authority in the area of police training, even if the Court has its doubts about the veracity of such statement.  _Id._  Although Plaintiffs could have added more specificity to their allegation by including the date on which Caraway made his statement and to which media source, for example, Plaintiffs were not required to plead so specifically at this stage.  _See Schultea v. Wood, 47 F.3d 1427, 1433-34 (5th Cir. 1995)_ (_en banc_) (holding that a heightened pleading standard only applies to section 1983 cases after the plaintiff is ordered to submit a Rule 7(a) reply following a defendant's assertion of the qualified immunity response).  Moreover, despite the handful of cases Defendant cites, all of which are several years old, and the City Charter that purports to limit Chief Brown's authority, it is plausible that the City Council has more recently delegated policymaking authority to him in the area of training his officers in the use of deadly force.  _See Worsham, 881 F.2d at 1344_ (noting that a policymaker can delegate final policymaking authority to a delegee even in the face of positive law).

The City's other cited cases are not on point.  _See, e.g., Davenport v. City of Garland, No. 09-cv-798-B, 2010 WL 1779620, *2-3 (N.D. Tex. 2010)_ (Stickney, M.J.) (finding that the plaintiff failed to name any final policymaker or allege any facts which would allow the court to make that determination), _accepted by_, 2010 WL 1779619 (N.D. Tex. 2010) (Boyle, J.); _Dorward v. Ramirez, No. 09-cv-0018-D, 2009 WL 2777880, *5 (N.D. Tex. 2009)_ (Fitzwater, C.J.) (holding that the plaintiff had not adequately pled that the police chief was a policymaker

where the plaintiff only stated that the individual was the chief of police and that he had approved an affidavit for a search warrant).  At this juncture, the Court accepts as true Plaintiffs' allegation as to Chief Brown's policymaking authority for purposes of the City's Rule 12 dismissal motion.  As such, the undersigned does not recommend dismissal of the claims against the City on the basis that Chief Brown is not a policymaker.  *Monell*, 436 U.S. at 694; *Bennett I*, 728 F.2d at 768.

    *2.  Policy or Custom*

    Next, the City contends that Plaintiffs have not identified any specific policy or custom that has the force of municipal policy of which the City's final policymakers were aware and deliberately indifferent to its risk of harm.  (Doc. 19 at 17-19).  Further, the City maintains that Plaintiffs have pled no facts from which one could make a reasonable inference of a persistent, widespread practice by DPD officers of making unlawful seizures or of using excessive force rising to the level of a custom having the force of an official municipal policy.  (Doc. 19 at 19-20).  Instead, Plaintiffs have pled only one instance of allegedly unlawful seizures and excessive force, namely Allen's encounter with Officer Staller, and a single incident does not give rise to a custom or policy.  (Doc. 19 at 19-20).

    Plaintiffs respond that their amended complaint specifies two customs/practices: (1) a DPD custom that encourages police officers to use excessive force and/or make unlawful arrests; and (2) a DPD custom of racial profiling that encourages DPD officers to treat African-American suspects differently than other suspects.  (Doc. 24 at 14-15).  Plaintiffs contend that they alleged specific facts to support each of the theories listed.  First, with regard to the City's custom and policy of permitting the use of excessive force and unlawful seizures, Plaintiffs point to the amended complaint's allegations that, *inter alia*, (1) Officer Staller had no description of Allen

or any information to suggest that he was dangerous; (2) Allen was unarmed; (3) Officer Staller fired at least ten bullets at Allen, striking him seven times, and then attempted to reload his pistol; (4) DPD officers have killed at least 60 other unarmed African-American men over the past 13 years; and (5) there are 94 open DPD internal affairs investigations into officer-involved shootings.  (Doc. 24 at 15-17).  Plaintiffs claim these facts are sufficient for this Court to draw a reasonable inference that Chief Brown was deliberately indifferent to the known or obvious consequences that constitutional violations would result from the DPD's customs.  (Doc. 24 at 16-17).

Plaintiffs also note that they included in their amended complaint sufficient factual allegations to support their theory that a persistent and widespread practice of permitting racial profiling was prevalent in the DPD, including that (1) Allen was a black male; (2) when Officer Staller arrived at the scene, he did not have a description of Allen or any information suggesting that he was dangerous; (3) McKnight-Simpson averred that Allen was complying with Officer Staller's instructions before Officer Staller repeatedly fired on him; and (4) since 2001, DPD officers have been involved in numerous shootings, 70% of which involved minorities.  (Doc. 24 at 19-20).

In reply, the City takes issue with the statistics Plaintiffs cite about officer-involved shootings of minorities, arguing that the relatively low rate of such incidents, considering the City's size, is not sufficient to demonstrate a custom of excessive force having the force of official policy.  (Doc. 27 at 2-3) (citing *Pineda v. City of Houston*, 291 F.3d 325 (5th Cir. 2002)).  With regard to Plaintiffs' claim of a custom of racial profiling, the City contends that Plaintiffs have pled no facts by which the Court can make a reasonable inference that non-African-Americans are treated differently than Allen was allegedly treated.  (Doc. 27 at 4).

a.   Policy of racial profiling

Although Plaintiffs purport to have included sufficient factual allegations to support their theory that there existed in the DPD a custom and practice of racial profiling, they have not included the required allegation that DPD officers treated Allen differently than they treated similarly-situated non-African-Americans.  *Bowlby*, 681 F.3d at 227.  Simply alleging that Allen was an African-American male whom Officer Staller had no reason to believe was dangerous and who was compliant, coupled with a statement that most DPD officer shootings involve minorities, is insufficient for the Court to make the inferential leap that the DPD has a custom or policy of racial profiling.  (Doc. 24 at 19-20).  It is recommended, however, that Plaintiffs be granted leave to amend their complaint to restate this aspect of their Fourth Amendment claim against the City, if they so desire.

b.   Policy of using excessive force

As an initial matter, the City argues that Plaintiffs pled no supporting facts in their amended complaint regarding DPD officers' alleged lack of training in the use of tasers and, consequently, any purported claim relating to the use of tasers should be dismissed.  (Doc. 19 at 23-24).  Plaintiffs have not responded to the City's argument.  The Court concurs with the City, and recommends that any claim based on the use of tasers should be dismissed.  *Bellard v. Gautreaux*, 675 F.3d 454, 462 n.2 (5th Cir. 2012) (holding that the plaintiff waived an argument by failing to properly brief it).

Plaintiffs have, however, pled several facts from which one could make a reasonable inference of a persistent, widespread practice by DPD officers of otherwise using excessive force rising to the level of a custom having the force of official City policy.  In particular, Plaintiffs alleged in their amended complaint that (1) the policy of the DPD is to shoot first and ask

questions later; (2) Councilman Caraway informed the media that there were training issues within the DPD that had resulted in the killing of an unarmed individual; (3) Dallas is at the top of the list of police misconduct statistics in the South along with several other Texas cities; (4) Dallas is ranked number 11 in police misconduct incidents; (5) the total number of officer-involved shootings was 144; (6) 86 grand juries had been convened to investigate police misconduct (although only two indictments have been returned); (7) 60 unarmed African-American men have been killed by DPD officers over the past 13 years; (8) at least 12 other shootings of unarmed individuals by DPD officers took place during the year of Allen's death (Plaintiffs describe the details of three of the shootings, all of which occurred after the incident involving Allen); and (9) there are 94 open DPD internal affairs investigations into officer-involved shootings.  (Doc. 15 at 4-9, 11-13).

Thus, contrary to the City's argument, Plaintiffs have pled more than one instance of an allegedly unlawful seizure and use of force.  The question is whether what they have pled is sufficient to demonstrate a persistent, widespread practice so as to constitute a policy or custom. The City points to the *Pineda* opinion to argue that they have not.  There, the appellate court held that 11 instances of arguably unconstitutional searches based on warrantless entries were not sufficient to establish a custom or practice.  *Pineda*, 291 F.3d at 329.  The court noted that the plaintiffs had drawn a sample size of 10 percent of relevant offense reports, culled those to locate unconstitutional warrantless entries, and persuaded the district court that the 11 incidents which fit the criteria were enough to defeat a summary judgment motion which was based on lack of proof of custom.  *Id.*  The appellate court reversed, noting both that the inference of the searches' illegality was not compelling and that the sample size was too small considering the size of the City of Houston and its police force.  *Id.*

The undersigned finds *Pineda* to be of limited persuasiveness given the factual differences between it and the present case.   First, although the appellate court does not say so, the 11 sample cases that the *Pineda* court looked at spanned a four-year period.   *Pineda v. City of Houston*, 124 F. Supp. 2d 1057, 1070 (S.D. Tex. 2000); *see also* *Peterson v. City of Fort Worth*, 588 F.3d 838, 850 (5th Cir. 2009) (holding that 27 complaints of excessive force over a three-year period were not sufficient to establish a pattern of excessive force that could be said to represent official policy).   In this case, Plaintiffs allege that DPD police shot at least 12 unarmed people in 2013, the year that Allen died (although it is not known how many of these incidents occurred after his death).   *See McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989) (stating that a pattern requires "sufficiently numerous prior incidents" as opposed to "isolated instances.").   Plaintiffs discussed three of those shooting incidents in sufficient detail in their amended complaint to denote the similarities to the allegations regarding Allen's shooting, namely that the individuals involved were not provoking or resisting the police when they were shot.   (Doc. 15 at 8-9).

Second, a warrantless entry differs significantly in seriousness and presumably in frequency from the shooting by a police officer of an unarmed person, whatever the circumstances of the shooting may turn out to be.   Therefore, it is reasonable to allow a lower number of incidents to establish a pattern of conduct in a shooting case.   *See Webster*, 735  F.2d at 842 ("Where the violations are flagrant or severe, the fact finder will likely require a shorter pattern of the conduct to be satisfied that diligent governing body members would necessarily have learned of the objectionable practice and acceded to its continuation.").   Further, Plaintiffs allege that, on average, more than four unarmed people have been killed by DPD officers each year for the past dozen years and that there are nearly 100 open internal affairs investigations

into such shootings and have been nearly as many grand jury proceedings.  While it is a close call, taking all of their allegations to be true, Plaintiffs have pled sufficient facts, at the motion to dismiss stage, from which one could make a reasonable inference of a persistent, widespread practice by DPD officers of using excessive force rising to the level of a custom having the force of official City policy.  *See Oporto v. City of El Paso*, No. 10-CV-110-KC, 2010 WL 3503457, *6 (W.D. Tex. 2010)* (noting that to survive a motion to dismiss on an unconstitutional customary-practice claim, a plaintiff must plead sufficient facts to allow the reasonable inference that there was a "pattern of misconduct"; declining to dismiss a policy of excessive force claim when the plaintiff alleged 32 prior incidents of excessive deadly force spanning 15 years); *Rivera v. City of San Antonio*, No. SA-06-CA-235-XR, 2006 WL 3340908, *12 (W.D. Tex. 2006)* (finding that an allegation of hundreds of complaints against police officers for excessive force, without any disciplinary action taken, was sufficient to state a claim of a municipal policy); *cf. Peterson*, 588 F.3d 838, 850-51 (upholding summary judgment dismissal on the ground that 27 incidents of excessive force over the course of three years, which ranged from minor lacerations to broken bones, was insufficient to demonstrate a policy or custom); *Allen v. Burnett*, No. 12-cv-4863-O, 2013 WL 2151218, *3 (N.D. Tex. 2013)* (O'Connor, J.) (dismissing as frivolous a municipal liability claim when the plaintiff only alleged one improper police action, which was committed against him, in arguing that the police department had adopted an unconstitutional policy or custom).

### iii. Deliberate Indifference of a Policymaker

The City next asserts that Plaintiffs fail to plead any facts that would allow the Court to infer that the City's policymaker acted with deliberate indifference. (Doc. 19 at 21).  Plaintiffs respond that they alleged in their amended complaint numerous facts to support their theory that

Chief Brown was deliberately indifferent to the known or obvious consequences that constitutional violations would result from the DPD's policy of using excessive force, including (1) Officer Staller's lack of information regarding Allen's description and the fact that he was unarmed; (2) Officer Staller's firing of ten bullets at Allen, seven of which struck him, and then attempting to reload his gun; (3) the shooting of 12 other unarmed individuals by DPD members in 2013; (4) the deaths of over 60 unarmed African-American men at the hands of DPD officers since 2001; and (5) the 94 open internal affairs investigations relating to officer-involved shootings.  (Doc. 24 at 15-19).

Upon consideration, and largely for the reasons argued by Plaintiffs, the Court finds that Plaintiffs have pled adequate facts demonstrating that Chief Brown, as alleged to be the City's final policymaker, adopted or maintained the policy of police use of excessive force with deliberate indifference to its known or obvious consequences.  *Johnson*, 379 F.3d at 309. Indeed, as suggested by the appellate court in *Burge*, Plaintiffs have demonstrated a pattern of similar violations.  *Burge*, 336 F.3d at 370 (stating that to show that a policy was adopted or maintained by policymakers with deliberate indifference as to its known or obvious consequences "generally requires that a plaintiff demonstrate at least a pattern of similar violations."); (Doc. 15 at 8-9).  In the context of withstanding this motion to dismiss, that is sufficient.

### iv. Moving Force Behind the Constitutional Violation

The City next argues that Plaintiffs have not pled any facts showing that there is a direct causal link between the City's allegedly unconstitutional policies and any deprivation of rights that occurred.  (Doc. 19 at 13, 22).  Plaintiffs note that they allege in their amended complaint that Chief Brown, as the City's policymaker, is at fault for Allen's death.  (Doc. 24 at 12).

The amended complaint states that Officer Staller's actions and the customs and policies of the DPD (the results of which had previously been alleged in detail) "caused Clinton Allen's wrongful death."  (Doc. 15 at 7-9, 12).  The amended complaint further alleges that Officer Staller was acting pursuant to the DPD's policies and procedures in regard to the use of deadly force, as authorized by Chief Brown and, as a result of Allen's rights being violated, Plaintiffs suffered damages.  (Doc. 15 at 14).  These averments are sufficient to adequately state that the City's alleged policy of using excessive force was the moving force behind the Fourth Amendment violation, was closely related to Allen's death, and actually caused the constitutional violation.  *Monell*, 436 U.S. at 694; *Johnson*, 379 F.3d at 310.  In short, Plaintiffs' excessive force claim should not be dismissed on this basis.

### C.  Failure to Train

Next, the City urges that Plaintiffs have not stated a failure to train claim because they did not plead facts showing that the City's policymakers were deliberately indifferent to a specific inadequacy in the training of DPD police officers.  (Doc. 19 at 13).  Additionally, the City asserts that Plaintiffs did not plead sufficient facts to permit a rational inference that its final policymaker was aware of widespread deficiencies in officer training, actually drew an inference of a substantial risk of a specific constitutional harm, and then disregarded that risk.  (Doc. 19 at 21, 23).

Plaintiffs respond that they have alleged sufficient facts to show that the City's failure to provide proper training in the use of deadly force amounts to deliberate indifference to the rights of persons with whom the police come into contact.  Specifically, Plaintiffs note, *inter alia*: (1) a witness stated that Allen was unarmed and complying with Officer Staller's instructions before Officer Staller shot him repeatedly; (2) at least 12 other shootings of unarmed individuals by

DPD officers took place during the year Allen died, and over 60 unarmed African-American men have been killed by DPD officers since 2001; (3) although Officer Staller had been the subject of several complaints, at least two of which involved inappropriate use of force, he was still permitted to carry a firearm; and (4) both Councilman Caraway and Chief Brown acknowledged the need for further DPD training.  (Doc. 24 at 20-23).  Plaintiffs submit that accepting these facts as true, they permit the court to draw the reasonable inference that their injuries were due to the lack of proper training.  (Doc. 24 at 22-23).

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 131 S.Ct. 1350, 1359 (2011). Nevertheless, under certain circumstances, a municipality can be liable for a failure to train its employees. *See Conner v. Travis Cty.*, 209 F.3d 794, 796 (5th Cir. 2000).  In such cases the plaintiff must show that: "(1) the municipality's training policy procedures were inadequate, (2) the municipality was deliberately indifferent in adopting its training policy, and (3) the inadequate training policy directly caused the constitutional violation." *Kitchen v. Dallas Cty.*, Case No. 13-10545, − F.3d –, 2014 WL 3537022, *9 (5th Cir. July 17, 2014). Under the applicable case law, there are two ways in which a plaintiff can establish a municipality's deliberate indifference to the need for proper training. The most common approach is for the plaintiff to demonstrate that a municipality had "[n]otice of a pattern of similar violations," which were "fairly similar to what ultimately transpired" when the plaintiff's own constitutional rights were violated.  *Id.* at *10.  The second approach is the limited exception for "single-incident liability" in the rare case where a constitutional violation would result from "the highly predictable consequence" of a particular failure to train.  *Id.*

The failure to train must amount to "deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). The failure to train must reflect a "deliberate" or "conscious" choice by the municipality – a policy − in order for a city to be held liable for such a failure. *Id.* at 389. "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Board of County Comm'rs v. Brown*, 520 U.S. 397, 410, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). "For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Smith v. Brenoettsy*, 158 F.3d 908, 912 (5th Cir. 1998).

In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform, and the identified deficiency in a city's training program must be closely related to the ultimate injury. *Canton*, 489 U.S. at 390-91. Thus, in order to properly plead a claim based upon alleged City customs of deficient training, Plaintiffs must plead facts supporting deliberate indifference by the City's final policymaker to a specific inadequacy in the City's training of DPD officers. The Supreme Court has noted that city policymakers know with certainty that their police officers will be required to arrest fleeing felons and therefore that the need to train officers in the constitutional limitations on the use of deadly force is "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights. *Canton*, 489 U.S. at 390 n.10 (citing *Garner*, 471 U.S. 1). The High Court also noted the possibility that the police, in exercising their discretion, so often violate constitutional rights that the need for further training in the use of

deadly force must be obvious to city policymakers, who, nevertheless, are "deliberately indifferent" to the need, thereby rendering the city liable. *Id.*

Based on the facts presented in Plaintiffs' amended complaint, Plaintiffs have sufficiently pled that (1) the City's training policy procedures were inadequate; (2) the City was deliberately indifferent in adopting its training policy; and (3) the inadequate training policy directly caused the constitutional violation. *Kitchen*, 2014 WL 3537022, *9; (Doc. 15 at 7-9, 12, 14). In particular, Plaintiffs allege that, (1) due to an acknowledged and obvious lack of training in the use of excessive force, DPD officers have shot dozens of unarmed individuals over the past several years based on the DPD's actual custom of "shoot first, ask later"; (2) due to this lack of training, Officer Staller caused Allen's death; and (3) Councilman Caraway and Chief Brown have both acknowledged the need for further officer training. (Doc. 15 at 7-9, 12). Moreover, Plaintiffs adequately assert in (1), *supra*, that the City had notice of a pattern of similar constitutional violations which were "fairly similar to what ultimately transpired" when Allen's constitutional rights were violated.[2] *Kitchen*, 2014 WL 3537022, at *10. From these facts, the inference can reasonably be drawn that the City's conduct evidences "deliberate indifference to the rights of persons with whom the police come into contact." *Canton*, 489 U.S. at 388. Further, Plaintiffs have set forth sufficient facts in their amended complaint to adequately allege that Chief Brown was both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and that he also drew the inference, to wit: (1) the large number of shootings of unarmed people over the years; (2) the number of pending internal and grand jury investigations; and (3) Chief Brown's own public statement about the need for more

---

[2] Because the Court finds that Plaintiffs have adequately demonstrated the City's pattern of similar violations, the undersigned does not address Plaintiffs' alternative argument in favor of "single-incident liability."

training.  *Smith*, 158 F.3d at 912.  Accordingly, Plaintiffs' failure to train claim should not be dismissed at this stage.

**IV.      CONCLUSION**

For the reasons stated, the undersigned recommends that the City's *Motion Pursuant to Rule 12(b)(6) to Dismiss the Plaintiffs' Federal Claims* (Doc. 19) be **GRANTED IN PART** to the extent that Plaintiffs' racial profiling claim and excessive force claim based on the policy of racial profiling be **DISMISSED WITHOUT PREJUDICE**.  Plaintiffs should be given 14 days from the date of this Recommendation to amend their complaint to re-plead those claims against the City.  Plaintiffs' Fourteenth Amendment claim for failure to train in relation to the use of deadly force, should be **DISMISSED WITH PREJUDICE**.  In all other respects, the undersigned recommends that the City's motion be **DENIED**.

**SO RECOMMENDED** on August 8, 2014.

RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## <u>NOTICE OF RIGHT TO APPEAL/OBJECT</u>

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n,* 79 F.3d 1415, 1417 (5th Cir. 1996).

RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE