IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| COLLETTE L. FLANAGAN, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF CLINTON ALLEN, DECEASED AND RONDERALINE S. ALLEN Individually | § § § § § § § | |
| Plaintiffs, | § § § | CIVIL ACTION NO. 3:13-CV-4231 |
| v. | § § § | JURY TRIAL DEMANDED |
| THE CITY OF DALLAS, TEXAS, AND CLARK STALLER, | § § § § § | |
| Defendants. | § | |

## PLAINTIFFS' FOURTH AMENDED COMPLAINT

COME NOW, Collete L. Flanagan, Individually as the surviving parent of Clinton Allen and on behalf of the Estate of Clinton Allen and Ronderaline S. Allen, as the surviving parent of Clinton Allen, Plaintiffs, complaining of Defendants, The CITY OF DALLAS, Texas, more particularly The CITY OF DALLAS Police Department, by and through its agent and servant acting in his official capacities and Officer Clark Staller, individually and in his official capacities as a Dallas police officer, and for cause would show the Honorable Court as follows:

## NATURE OF THE ACTION

1.      This is an action brought by the Plaintiffs against The CITY OF DALLAS for Officer Clark Staller's individual use of deadly force, assault, unlawful arrest and detention resulting in the wrongful death of Clinton Allen ("Allen") under the color of law in violation of his individual rights under the Fourth Amendment of the United States Constitution and in violation of his civil rights pursuant to 42 U.S.C. § 1983.  Furthermore, Plaintiffs are entitled to

**PLAINTIFFS' FOURTH AMENDED COMPLAINT**                                                                                      **Page 1**

recover individually and as representatives for the Estate of Clinton Allen to the full extent applicable by law under the Texas Wrongful Death Statute, Tex. Civ. Prac. & Rem. Code Ann. § 71.001, et seq., the Texas Survival Statute, Tex. Civ. Prac. & Rem. Ann. Code § 71.021, and all other applicable laws complaining of the various acts listed below and for their wrongful death and survival cause of action.

2.      Plaintiffs allege that the Dallas City Councils delegated with the authority for setting policies, including training of the Dallas Police officers and Chief of Police, David O. Brown ("Brown") had a duty, but failed to implement and/or enforce policies, practices and procedures for the Dallas Police Department ("DPD") that respected Clinton Allen's constitutional rights to protection and equal treatment under the law.  The duty to manage and train Dallas Police Officers were delegated to Chief Brown by the Dallas City Council. Defendant The CITY OF DALLAS, the policymaker, the Dallas City Council and Chief Brown's failure to implement the necessary policies and the implementation of unconstitutional policies deprived Clinton Allen of equal protection and due process under the Fourth Amendment and caused his unwarranted and excruciating physical and mental anguish and death.  For these civil rights violations and other causes of action discussed herein, Plaintiffs seek answers and compensation for their damages and the wrongful death of Clinton Allen.

## PARTIES

3.      Plaintiff, Collette L. Flanagan is a citizen of the United States and a resident of Dallas County, Texas.  Collette L. Flanagan is the mother of Clinton Allen, decedent, and brings this wrongful-death action pursuant to the Texas Survival Statute, Tex. Civ. Prac. & Rem. Code § 71.021, as the parent of Clinton Allen who, at the time of his death, was a resident of Dallas County, Texas.

4.      Plaintiff, Ronderaline S. Allen is a citizen of the United States and a resident of Dallas County, Texas.  Ronderaline S. Allen is the father of Clinton Allen, decedent, and brings this wrongful-death action pursuant to the Texas Survival Statute, Tex. Civ. Prac. & Rem. Code § 71.021, as the parent of Clinton Allen who, at the time of his death, was a resident of Dallas County, Texas.

5.      Defendant The CITY OF DALLAS, is a municipality located in Dallas County, Texas. The CITY OF DALLAS operates the Dallas Police Department ("DPD").  The CITY OF DALLAS funds and operates the DPD, which, along with the Dallas City Manager's office, Chief Brown and Mayor Rawlings are responsible for the implementation of the police department's budget, policies, procedures, practices, and customs, as well as the acts and omissions, challenged by this suit.  The CITY OF DALLAS POLICE DEPARTMENT is also responsible for preventive, investigative, and enforcement services for all citizens of The CITY OF DALLAS. The CITY OF DALLAS has been served and have appeared in this case.

6.      Defendant Clark Staller ("Staller"), upon information and belief, is a resident of Dallas County, Texas, and at all times material herein was a police officer acting in the course and scope of his employment for The CITY OF DALLAS and DPD.  Clark Staller has been served and has appeared in this case.

## JURISDICTION AND VENUE

7.      Jurisdiction exists in this court pursuant to 28 U.S.C. §§ 1331 and 1343 as this action is brought under, inter alia, the Fourth Amendment of the United States Constitution and 42 U.S.C. § 1983, to redress the deprivation of rights, privileges and immunities guaranteed to decedent, Clinton Allen, by constitutional and statutory provisions.  Plaintiffs further invoke the supplemental jurisdiction of this court pursuant to 28 U.S.C. § 1367 to adjudicate pendent claims

arising under the laws of the State of Texas.

8.      Venue is proper in this court under because the causes of action occurred within the Northern District of Texas, Dallas Division.

## STATE ACTION

9.      To the extent applicable, Defendant Clark Staller was acting under color of state law when he subjected Clinton Allen to the wrongs and injuries hereinafter set forth.

## FACTS

10.      On or about March 10, 2013 Clinton Allen, a 25 year old unarmed black male, upon information and belief, was confronted by a Dallas Police Officer identified as Defendant Clark Staller ("Staller") for no lawful reason, at the parking lot of the Rosemont Apartments (the "Rosemont").  Defendant Staller had no idea who Allen was when the foot pursuit, harassing and deadly conduct began.  Earlier that evening, Allen was at the resident of Mandria Kelly and made plans to return but when he arrived back she had company and became very irritated that Allen showed up at her residence, so,  to appease her guest, she called 911 to report that "someone was at her door and would not go away.  Mandria Kelly did not tell the 911 operator she feared for her life nor did she state Allen was armed and dangerous."

11.      The call to 911 was placed by Mandria Kelly at approximately 12:26 a.m. and less than 10 minutes later, Allen was dead.  According to statements provided by Mandria Kelly, *attached hereto as **Exhibit A**,* Defendant Staller arrived at the apartment complex, and before she had a opportunity to give him any information or a description of Allen, he saw an unidentified person walking towards the parking lot, and initiated a foot pursuit.  Defendant Staller did not go to the residence of the individual who made the 911 call nor did he talk to anyone to determine who he was looking for or what the situation was.  There were no reports

and/or evidence that Allen was armed with a weapon nor did Mandria Kelly indicate she felt threatened by Allen.  This was evidenced by the 911 radio dispatch to police officers, which was produced by The CITY OF DALLAS.

12.     Defendant Staller had no probable cause or reasonable suspicion to believe that Allen was or had committed a crime.  In fact, when Defendant Staller arrived to the Rosemont, Allen was attempting to leave because he did not want any problems.  Based upon information made available to Plaintiffs and investigators for the DPD, eyewitness Vickie McKnight-Simpson ("Vickie McKnight") indicated that Allen was approached by Defendant Staller and commanded to raise his hands, which he complied.  Defendant Staller did not have a clue that Allen was the person he was searching for.  Upon information and belief and according to McKnight and other witnesses, Clinton Allen was complying with the instructions given by Defendant Staller, by walking towards Defendant Staller with his hands visible and raised, as instructed. *See affidavit of Vickie McKnight attached hereto as Exhibit B*.

13.     According to McKnight and upon information and belief, she did not observe Allen choking Defendant Staller as he claimed nor was he attempting to attack Defendant Staller when he shot and struck him at least seven times.  Upon information and belief and according to McKnight, "at one point, when Defendant Staller shot Allen on the left hand side, upper chest, towards the left arm, Allen held his right hand up, as if to ask the policeman to stop shooting him. *See affidavit of Vickie McKnight attached hereto as Exhibit B*.  McKnight further indicated that Allen took his right hand and placed it over where he had been shot in his upper left chest, looked at the blood and also looked at Defendant Staller in disbelief as he struggled for his life.  Defendant Staller fired several more shots at Allen, striking him while he laid helpless in pain and faced with imminent death.  McKnight further stated: "I witnessed the shooting of

this young man and I saw no aggression, no fighting, no acting out or anything from this young man, but still, the policeman kept shooting him and yelling for him to put his hands up, but he was already shot and he was shooting him even while he was still telling him to put his hands up." "The young man was trying to comply but he had been shot so many times, all he could do was fall to the ground." McKnight further stated that "she personally felt like Defendant Staller did not have to continue shooting Allen. This young man ("Allen") did not put up a fight or anything, but yet he kept shooting him. McKnight further stated that she heard Defendant tell another officer, that he "had to unload and reload another clip." McKnight indicated that she felt like this should not have happened. *See affidavit of Vickie McKnight attached hereto as Exhibit B*."

14.    Defendant Staller fatally shot Allen seven times even though he fully complied with Defendant Staller's instructions. Based upon eyewitness testimony, Officer Staller was not in any danger and Clinton Allen was not a threat nor did he do anything to cause Defendant Staller to fear for his life. *See affidavit of Vickie McKnight attached hereto as Exhibit B*.

15.    Despite being unarmed and struggling to stay alive, Defendant Staller did not attempt to assist Allen. In fact, he was observed telling another officer that he had to "unload and reload" another clip. *See affidavit of Vickie McKnight attached hereto as Exhibit B*. Several bullet holes were found on a vehicle parked at the Rosemont, suggestion that at least 10 or more shots were fired by Defendant Staller.

16.    As a result of Defendant Staller's deadly and unlawful attack on Allen, Allen sustained multiple injuries, including injuries to his face, head, and extremities, in addition to the fatal gunshot wounds.

17.    Defendant Staller has been the subject of a number of complaints. In 2009,

Defendant Staller was investigated for the inappropriate and/or unnecessary use of force. In 2010, Defendant Staller was involved in a preventable accident. In 2011, Defendant Staller placed a person in danger when he hit a vehicle burglary suspect with his squad car and was cited for the inappropriate or unnecessary use of force, untruthfulness to a Supervisor and filing a false report. Defendant Staller only received a 20-day suspension and was not required to undergo any mental testing. The summary of the 2011 incident was documented as follows:

• **"Suspects lie all the time," Staller said.**

Staller denied intentionally hitting the man and said he did not realize initially that he had hit the man.

• **"There was no intent to deceive or falsify information on my part," he wrote in his statement to internal investigators.**

A supervisor who responded to the scene asked Staller if he had hit the man with his squad car. Staller replied, **"No, I did not hit him."** He also told an accident investigator that he had not hit the man. During his disciplinary hearing, Staller said he now understood that trying to block the man with his squad car was the wrong thing to do.

• **"You have to understand that a vehicle is weapon and I realize I screwed that up. I should have not have done that,"** he said, according to an audio recording obtained by The Dallas Morning News. Assistant Chief Vince Golbeck, who supervises the city's seven patrol stations, said he did not believe that he didn't immediately know he had hit the man.

• **"This whole situation is very disturbing to me," Golbeck told Staller during the hearing. "It's hard to me to understand that a trained officer hits an individual and does not know about it."**

An internal investigation found that Defendant Staller lied about the incident.

In 2012, Defendant Staller was involved in a preventable accident. On March 8, 2013, just days before the shooting death of Allen, Defendant Staller had allegations of inappropriate or unnecessary use of force and improper comments brought against him.

The CITY OF DALLAS, the Dallas City Council, the DPD and Chief Brown knew of Defendant Staller's behavior and lack of training but did nothing to protect Allen and others from

the harm he suffered.  Despite Defendant Staller's history, he remains a Dallas Police Officer.

18.      Defendant, The CITY OF DALLAS and DPD has a longstanding record of not providing Dallas Police Officers with adequate training, not preventing excessive force and extrajudicial killings by Dallas Police officers.  The actual practice or custom of the DPD regarding the use of deadly force was to shoot first and ask questions later.  Actions taken and public pronouncements by Dallas Mayor Mike Rawlings and Dallas Police Chief David Brown demonstrate that the Mayor and Police Chief, as well as the Dallas City Council, are final decision-makers and policymakers for many of the customs, practices, policies and procedures complained of herein.  In addition, Dallas City Councilman Dwaine Caraway recently confirmed in an interview to newsmakers that the Dallas City Council, and The CITY OF DALLAS had in fact delegated policy-making authority and the training of the Dallas Police Officers to Chief Brown, giving him the responsibility for setting training policies and that there were training issues which resulted in the killing of an unarmed individual.  As a result of the lack of training and the official custom or policies of the DPD, numerous incidents have taken place in The CITY OF DALLAS under the direction of the Dallas City Council.  In fact, City Councilman Caraway acknowledged that there are issues with police training.  Chief Brown admitted that "there is a need for a foot pursuit policy and additional police training after several police involved shootings of unarmed black males. "The lack of police training has led to the following incidents and/or statistics:

- Dallas is at the top of the list of police misconduct stats in the South, along with Houston, San Antonio and Irving

- Dallas ranked #11 in the highest police misconduct rates, ranking higher than all of Orange County, California.

• Dallas ranked second nationally in police misconduct incidents, behind #1 New Orleans.

• There's been 185 police shootings between 2002 and mid-2013. Of those shootings, 58 were fatal, and 43 of the people who were fatally shot by police were black or Hispanic.

• From 2013-2014, over 40 individuals have been involved in an Officer Involved Shooting.

19.     In 2013 alone, there have been at least 12 Dallas Police shootings of unarmed individuals.  On or about October 14, a DPD officer shot Bobby Bennett ("Bennett"), an unarmed individual and attempted to falsify a police report.  David Blair, an unarmed individual was standing outside of his east Oak Cliff apartment on October 2, 2013, when a pair of Dallas police officers approached him and shot at him at least 14 times for no lawful reason.  Blair's story surfaced just a week after video circulated of a Dallas police officer shooting Bennett, a man with mental challenges after he stood up from a chair he set in the middle of a cul-de-sac. Police initially claimed the man lunged at them, but the video showed otherwise. An aggravated assault charge against the wounded man has since been dropped.  On December 10, 2013, 19-year-old Kelvion Walker was still in the vehicle with his hands up when a Dallas police officer shot him.  He remains in critical condition. There exist, a persistent, widespread practice of police shootings that results from the training or lack thereof, received by DPD officers.  Upon information and belief, DPD officers are trained by individuals with little or no experience working in the field.

20.     Recommendations for revisions in the DPD's policies and procedures regarding the use of deadly force were made by Geoffrey P. Alpert in 1987.  It was stated in the report that to reduce the police use of deadly force in Dallas, and at the same time to protect the safety of

the citizens and officers, a new philosophy and a new approach would be required. In order for Dallas to enter the 1990's with a set of police policies, procedures and customs commensurate with its high set of municipal values, a conscious decision must be made to overhaul a system creaking with age and tradition, and made obsolete by the challenges of a new generation of citizens.

21.     The Dallas City Council, which authorized this study, outlined the five major areas to be examined. These include:

a) The Police Officer Applicant Selection Process;
b) Teaching Methods and Materials on the Use of Deadly Force;
c) "Shoot-Don't-Shoot" Training;
d) Weapons' Training; and
e) Policies Relating to the Use of Deadly Force.

22.     It was recommended that a formal procedure such as an Early Warning System be developed and implemented to identify officers who are prone to emotional instability or behavior problems. It was clear that The CITY OF DALLAS, the Dallas City Council and Chief Brown knew of Defendant Staller's Emotional instability, but did nothing to correct the problem as recommended. It was recommended that all officers be required to participate in at least 40 hours of in-service training each year which is selected and designed to update them on departmental philosophy, procedures, skills and techniques. It was further recommended that any training which places recruits or officers in stressful situations should be used to assist in improving the individual's performance. For example, an Early Warning System which can assist in the identification of officers who are experiencing stress could eliminate harmful consequences of stress or performance problems before they occur. Although no particular set of criteria can determine stress or performance problems, a system can be established to identify those officers who may be experiencing problems. An early warning system makes no

conclusions or determination about stress or performance, but does assist supervisory personnel in evaluating potentially troublesome behavior. Simple criteria including complaints made against the officer, number of times officer has used force, involvement in traffic accidents can be among the factors used to identify officers who may be heading for trouble. Defendant Staller had a history of problems that were ignored by the DPD, the Dallas City Council and Chief Brown.

23.   As indicated above, Defendant Staller attacked Clinton Allen, using excessive and deadly force for no lawful reasons. During this time, Defendant Staller tased Clinton Allen and continued his assault upon Clinton Allen by delivering seven fatal shots, killing him in cold blood.

24.   There is no evidence that Defendant Staller or any bystanders were in imminent danger. There were no signs of any visible injuries or bruising to Defendant Staller's body that would indicate that the use of deadly force was justified.  The DPD Drawing or Displaying Firearms policy requires that a threat or reasonable belief that there is a threat to life or they have reasonable fear for their own safety and/or the safety of others, exist in order to authorize an officer to draw or display her/his firearm. Upon information and belief, DPD officers are not provided with adequate training. Once a year, Chief Brown requires DPD Officers to receive both active and simulating training, with the majority of the training requiring shooting. This policy has led to high number of police shootings in Dallas.

25.   As made clear from McKnight and the DPD shooting summary submitted to the FBI, Allen posed no risk to Defendant Staller or any other person in the immediate area by simply attempting to leave. Additionally, independent witness statements and the 911 call further confirm that Ms. Kelley at no time stated she was in danger or fear for her life.

26.     The DPD shooting summary goes on to describe that after verbal commands were given by Defendant Staller, Allen complied but Defendant Staller holstered his weapon and drew a taser.  General Order 901.04(D)(3) Levels of Control ; Electronic Control Weapon (taser) is an intermediate weapon, and is only justified for situations when the officer believes empty hand control will be ineffective.  Empty hand control techniques include joint locks, pressure points, Oleoresin Capsicum Spray, hand held aerosols, and pepper ball saturation, none of which occurred before the drawing of Defendant Staller's duty weapon.

27.     At the time Defendant Staller drew his weapon, there had been no previous interaction between Allen and Defendant Staller, and at no time did Allen resist in any way to justify the use of deadly force.  The drawing of an Officer's weapon inherently assumes that the use of force will cause death or serious bodily injury to the suspect, and is to be applied under very narrowly defined circumstances.  According to Dallas Police General Order 906.02(D) Authorization to Use Deadly Force authorized by the Dallas City Council and Chief Brown, "Officers will only use deadly force to protect themselves or another person from imminent death or seriously bodily injury".  General Order 906.02(E) Drawing or Displaying Firearms; requires that a threat or reasonable belief that there is a threat to life or they have reasonable fear for their own safety and/or the safety of others, exist in order to authorize an officer to draw or display her/his firearm.  Allen posed no risk to Defendant Staller, or any other person by attempting to leave the Rosemont.  Additionally, independent witness statements made by Ronderlan Allen and Mandria Kelley and the 911 call further confirm that Ms. Kelley at no time stated she was in fear or danger.

28.     Defendant Staller's unlawful and unwarranted acts, lack of training, the CITY OF DALLAS' negligence and the official customs or policies of the DPD caused Clinton Allen's

wrongful death.

29.     Plaintiffs would show that at all times material hereto, Defendant Staller was acting in the scope of his employment as agent, servant, and employee of Defendant The CITY OF DALLAS, specifically the DPD, within its executive branch and was performing a governmental function.

30.     Plaintiffs would further show that Defendant Staller's actions were the result of, or within the scope of, wrongful and reckless customs, policies, practices and/or procedures of the DPD in regards to the use of deadly force for which The CITY OF DALLAS and Chief Brown knew or should have known but never provided the requisite and proper training.

31.     Allen was twenty five (25) years old when he was killed by Defendant Staller.  He was in good health, with a reasonable life expectancy of living at least 59 more years to age 84. Clinton had a promising career that was ended with his death.

32.     Moreover, no reasonably competent official would have concluded that the actions of Defendant Staller described herein would not violate Clinton Allen's rights. In other words, no reasonably prudent police officer under similar circumstances could have believed that Defendant Staller's conduct was justified.

33.     As a direct and proximate result of Defendants' conduct, Plaintiffs have sustained substantial damages and pecuniary loss.

34.     Upon information and belief, the DPD has not implemented policies and procedures to aggressively curtail deadly shooting cases and foot pursuits that have been a major problem since the early eighties when the DPD was the subject of a Federal Investigation and continues to exist today.

## EXCESSIVE FORCE
## COUNT I-42 U.S.C. § 1983

35.     Plaintiffs incorporate by reference paragraphs 1 through 34 as if fully set forth herein.  Plaintiffs would show that Defendant Staller's actions on the occasion in question were wrongful and constituted negligence in depriving Allen of his constitutional rights, as alleged more fully below.

36.     Plaintiffs would show that at all times material hereto, Defendant Staller had a duty to avoid infliction of unjustified bodily injury to Allen, to protect his bodily integrity and to not trample on his constitutional rights.

37.     Plaintiffs would show that Defendant Staller failed to act as a reasonable police officer would have acted in the same or similar circumstances.  That is, Defendant Staller, without justification and the need to do so, tased, disabled, shot and used excessive and deadly force as described above and killed Allen without probable cause and/or legal justification. Allen never made any threatening gestures towards the Defendant Staller and attempted to save his life by escaping the assault.

38.     Plaintiffs would further show that the Defendant Staller repeatedly shot Allen causing bruising and multiple wounds to his body.  Defendant Staller was not provoked when he attacked Allen for no lawful reason.  Allen died as a result of multiple gunshots to his body by Defendant Staller.   The excessive and deadly force used by Defendant Staller was not reasonable, justified nor was it necessary under the circumstances.

39.     Defendant Staller's actions were not objectively reasonable because he followed a procedure designed to inflict excessive and deadly force in restraining individuals in a non-life threatening situation.  Allen was shot 7 times in cold blood while he was subdued.

40.     Plaintiffs would show that the Defendant Staller denied Clinton Allen his right to be free from deprivation of his rights without due process of law, in violation of the Fourth Amendments to the United States Constitution.  Plaintiffs would show that Defendant Staller was acting within the custom, policy, practice and/or procedure of the DPD in regards to the use of deadly force as authorized and/or ratified by the Dallas City Council and Chief Brown at the time of the incident.

41.     The force used by the Defendant Staller was unnecessary and unreasonable under the circumstances, as Clinton Allen, namely cooperating with Defendant Staller, did not require the use of such excessive and deadly force.  Clinton Allen was complying with the instructions given by Defendant Staller when Defendant Staller for no lawful reason attacked him.  Defendant Staller had no probable cause to suspect that a crime was being committed or that his conduct was reasonable.  As a result, Clinton Allen suffered an injury which resulted directly and only from the use of force that was clearly excessive to the need (again, since there was no need at all), and the force used was objectively unreasonable and violation of clearly established law.

42.     As a result of these Constitutional violations to Clinton Allen and the injuries he sustained resulting in his death, Plaintiffs seek compensation as set forth more specifically in the section of this Complaint entitled "Damages."

### RACIAL PROFILING
### COUNT II CIVIL RIGHTS ACTION

43.     Plaintiffs incorporate by reference paragraphs 1-42 as if fully set forth herein.

44.     Racial Profiling:   Plaintiffs would show that Defendant Staller clearly and wrongfully used race as a factor, a proxy, for reasonable suspicion and using excessive force on Allen.  Allen was treated differently than similarly –situated non-African Americans and as an

illustration points to the following statistics:  From 2000-2013, there were seventy plus unarmed Black and Hispanic deaths as a result of police shootings. Over 56% of the fatalities were black. There were few, if any, white males killed during that same time period.  Additionally, Plaintiffs would show that it is the official customs, policies and practices of the DPD in regards to the use of deadly force as authorized and/or ratified by the Dallas City Council and Chief Brown to treat African Americans in a cruel manner regardless of the circumstances or the need to because of a systematic pattern of stereotyping developed by the DPD.  The facts show that there was no probable cause for Allen's arrest.  In fact, Plaintiffs would show that the excessive force used by Defendant Staller was not reasonable nor was it necessary as Allen was complying with the directions given by Defendant Staller, not violating any laws.  Defendant Staller treated Allen in the manner he did because he was a black male.  The poor treatment of African Americans by the DPD, mainly Defendant Staller, is a well known fact in Dallas, Texas.  Plaintiffs would show that Defendant Staller's actions were in violation of TEX. CODE CRIM. PROC. ANN. Art. 2.131-137 (Vernon Supp. 2004) and is therefore strictly liable to Plaintiffs.

45.     Plaintiffs would show that Defendant Staller was acting within established wrongful and reckless customs, policies, practices and/or procedures of the DPD in regards to the use of deadly force as authorized and/or ratified by the Dallas City Council and Chief Brown at the time of the incident and further that the Defendant The CITY OF DALLAS  knew or should have known of these said malicious customs, policies, practices and/or procedures for which the Dallas City Council and Chief Brown knew or should have known but never provided the requisite and proper training. Defendant Staller under the color of law, deprived Allen of his civil rights, privileges or immunities secured by the Constitution and laws pursuant to 42 U.S.C. § 1983.    As a result of these Constitutional violations to Clinton Allen and the injuries he

sustained resulting in his death, Plaintiffs seek compensation as set forth more specifically in the section of this Complaint entitled "Damages."

**FAILURE TO TRAIN**
**COUNT III 42 U.S.C. § 1983**

46.     Plaintiff incorporates by reference paragraphs 1 through 45 as if fully set forth herein.

47.     Defendant Staller, acting under color of law and acting pursuant to customs, practices and policies of The CITY OF DALLAS and the DPD in regards to the use of deadly force and foot pursuits as authorized and/or ratified by Chief Brown deprived Allen of rights and privileges secured to him by the Fourth Amendment to the United States Constitution and by other laws of the United States, by failing to provide proper training in the use of deadly force and foot pursuits in violation of 42 U.S.C. § 1983 and related provisions of federal law and in violation of the above cited constitutional provisions.  The DPD and Chief Brown deliberate indifference in failing to train based on the obviousness of the need for training has resulted in a number of shootings involving unarmed individuals, including Allen.

48.     With respect to the claims made the basis of this lawsuit, The CITY OF DALLAS and the DPD failed to adequately train its employees regarding the use of deadly force and foot pursuits. This failure to train its employees in a relevant respect reflects a deliberate indifference to The CITY OF DALLAS, the Dallas City Council, DPD and Chief Brown to the rights of the city's inhabitants and is actionable under 42 U.S.C. § 1983.

49.     Defendant The CITY OF DALLAS and DPD under the direction of the Dallas City Council and Chief Brown developed and maintained a policy of deficient training of its police force in the use of force, including the use of deadly force in the apprehension of individuals.  The CITY OF DALLAS ' training is designed and implemented by of the Dallas

City Council and Chief Brown to act in this regard.  The actual practice or custom of the DPD regarding the use of deadly force was to shoot first and ask questions later.

50.     The CITY OF DALLAS and the DPD's' failure to provide adequate training to its police officers regarding the use of deadly force reflects deliberate indifference by of the Dallas City Council and Chief Brown and reckless and conscious disregard for the obvious risk that officers would use excessive or deadly force on citizens and made the violations of Clinton Allen's constitutional rights, including his death, a reasonable probability.

51.     Plaintiffs would show that Defendant Staller's actions were the result of, or within the scope of, wrongful and reckless customs, policies, practices and/or procedures for which The CITY OF DALLAS and of the Dallas City Council and Chief Brown knew or should have known but never provided the requisite and proper training.

52.     Upon information and belief, Defendant The CITY OF DALLAS, DPD, the Dallas City Council  and Chief Brown, acting through official policies, practices, and customs, and with deliberate, callous, and conscious indifference to the constitutional rights of Allen failed to implement the policies, procedures; and practices necessary to provide constitutionally adequate protection and assistance to Allen during his struggle to survive and implemented policies, procedures, and practices which actually interfered with or prevented with or prevented Allen from receiving the protection, assistance and care he deserved.

53.     For instance, the following conduct, policies, and customs, *inter alia*, by Defendants violated Allen's constitutional rights:

a. The CITY OF DALLAS' and the DPD failure to adequately train or discipline its officers;

b. Defendants' policy on the use of deadly force, which encourages officers to shoot first and ask questions later;

c. Defendants' foot pursuit policy;

d. Failing to recognize officers with emotional problems based on prior violations;

g. Failure to conduct the type of investigation that would have been conducted had he not been a minority or a resident in a high crime area;

h. Failure to get more police employees properly trained to professionally handle foot pursuits.

i. 72-hour waiting period policy allows perpetrators of deadly shootings to walk free.

54.    In addition, the Dallas City Council, and Chief Brown as applicable, failed and refused to implement customs, policies, practices or procedures, and failed to train its personnel adequately on the appropriate policies, practices or procedures regarding the use of deadly force or when and how to initiate a foot pursuit.  In so doing, Defendant The CITY OF DALLAS knew that it was acting against the clear dictates of current law, and knew that as a direct consequence of their deliberate decisions, the very situation that occurred -- *i.e.*, Allen's death -- in all reasonable probability would occur.

55.    Defendants' actions demonstrate that before his death Allen was the victim of purposeful discrimination, either because of his race and/or gender, or due to an irrational or arbitrary state classification unrelated to a legitimate state objective.

56.    Additionally, no rational basis existed for The CITY OF DALLAS, the Dallas City Council and the DPD's alleged policies of affording minorities less police protection or assistance than other crime victims or giving these victims less investigative attention than other victims.  Furthermore, unlike what officer Staller did, no reasonably prudent police officer, under similar circumstances, would have used deadly force or would initiated a foot pursue with first confirming they had the right person.  Moreover, no reasonably competent official would have concluded that the actions of The CITY OF DALLAS and Defendant Staller described herein

would not violate Allen's rights. In other words, no reasonably officer, under similar circumstances, could have believed that their conduct was justified.

57. The CITY OF DALLAS and the DPD's failure to properly train its police officers regarding the use of force under the authority of the Dallas City Council and Chief Brown was the proximate cause of the violations of Allen's constitutional rights including the unnecessary taking of his life. As a result of these Constitutional violations to Clinton Allen and the injuries he sustained resulting in his death, Plaintiffs seek compensation as set forth more specifically in the section of this Complaint entitled "Damages."

**FALSE ARREST**
**COUNT IV – 42 U.S.C. § 1983**

58. Plaintiffs incorporate by reference paragraphs 1 through 57 as if fully set forth herein.

59. Additionally, and in the alternative, Plaintiffs would show that Defendant Staller's actions were objectively unreasonable and done in bad faith in that he arrested Allen without probable cause, after shooting him. Allen did not commit a crime as the evidence would show. Plaintiffs would further show that they have suffered damages within the jurisdictional limits of this court as a result of the wrongful arrest and that such arrest was done under color of law. Plaintiffs would show that Defendant Staller was acting within the official customs, policies, practices and/or procedures in regards to the use of deadly force and foot pursuits as authorized and/or ratified by the Dallas City Council at the time of the incident. Plaintiffs would additionally show that such wrongful arrest was done in violation of Allen's rights under the Fourth Amendment of the United States Constitution, as incorporated to the states by the Fourteenth Amendment, and that Plaintiffs have suffered damages within the jurisdictional limits of this court as a result of the violations of their rights.

60.     Defendant Staller was acting under the color of law when he deprived Clinton Allen of his constitutional right to be free from false arrest.

61.     Additionally and in the alternative, Plaintiffs would show that Defendant Staller's actions were objectively unreasonable and done in bad faith because Defendant Staller was without probable cause to think that Allen had committed a crime.  Plaintiffs would further show that they have suffered damages within the jurisdictional limits of this court from the wrongful and deadly shooting of Allen and said shooting was done under color of law.  Plaintiffs would show that Defendant Staller was acting within custom, policy, practice and/or procedure of The CITY OF DALLAS, the Dallas City Council and DPD in regards to the use of deadly force as authorized and/or ratified by the Dallas City Council at the time of the incident.  Plaintiffs would additionally show that such wrongful shooting was done in violation of Clinton Allen's rights under the Fourth Amendment of the United States Constitution, as incorporated to the states by the Fourteenth Amendment, and that as a result of these Constitutional violations to Clinton Allen and the injuries he sustained resulting in his death, Plaintiffs seek compensation as set forth more specifically in the section of this Complaint entitled "Damages."

**<u>NEGLIGENCE</u>**
**COUNT V.**

62.     Plaintiffs incorporate by reference paragraphs 1 through 61 as if fully set forth herein.

63.     The CITY OF DALLAS owed Allen a legal duty to protect him from the harm and injuries he suffered, which ultimately resulted in his death. Defendant Staller, while acting in his official capacity, used his gun (personal property) in a negligent manner to fatally shoot Allen.

64.     Defendant Staller had a duty to employ only reasonable measures in the treatment of the decedent.

65.     Notwithstanding said duties, Defendant Staller acted in a wanton and willful manner, exhibiting such carelessness and recklessness as to evince a conscious disregard for the life and safety of Allen.

66.     Defendant Staller was aware that Allen had not committed a crime and Defendant Staller was not facing any imminent or serious threat of bodily harm or death.  Thus, he knew or should have known that he had no right to use any force whatsoever with respect to Clinton Allen.  He nonetheless illegally apprehended Allen through his use of deadly force by shooting him seven times.

67.     Defendant Staller knew or should have known that his course of action of drawing his lethal weapon and firing it at Allen would place him in grave danger of serious injury, which it did.

68.     As a direct cause and result of the breach of duty as set forth herein, Plaintiffs incurred extreme pain and injuries for which they seek compensation as set forth more specifically in the section of this Complaint entitled "Damages."

## TEXAS SURVIVAL ACTION
## COUNT VI

69.     Plaintiffs incorporate by reference paragraphs 1 through 68 as if fully set forth herein.

70.     Pursuant to Tex. Civ. Prac. & Rem. Code Ann. § 71.021, the decedent's right of action for wrongful and negligent conduct against Defendant Staller survives in favor of heirs, legal representatives, and the estate of the deceased.

71.     Defendants are liable to Plaintiffs for the loss of Allen's life, pain and suffering, and the violation of his civil rights.

## TEXAS WRONGFUL DEATH ACT
### COUNT VII

72.     Plaintiffs incorporate by reference paragraphs 1 through 71 as if fully set forth herein.

73.     Plaintiff Collette Flanagan is the legal administrator for the estate of Clinton Allen.

74.     Allen died as a result of Defendant Staller's wrongful conduct.

75.     Allen would have been entitled to bring this action against Defendant Staller if he had lived.

76.     By reason of Defendant Staller's wrongful conduct of shooting to death an unarmed individual without the imminent threat of serious bodily harm, Defendants are liable for damages.

77.     Defendant Staller's conduct that caused Allen's death was a producing cause of injury to Allen, which resulted in the following damages: loss of a family relationship, love, support, services, emotional pain and suffering, and for his intentional and reckless acts and infliction of emotional distress caused by the wrongful killing of Allen.

78.     Plaintiffs seek unliquidated damages within the jurisdictional limits of this Honorable Court.

79.     Allen's death resulted from Defendant Staller's willful act or omission or from Defendant Staller's gross negligence, which entitles Clinton Allen's heirs to exemplary damages under the Texas Constitution article 16, section 26.

## DAMAGES ALL DEFENDANTS
### COUNT VIII

80.    Plaintiffs incorporate by reference paragraphs 1 through 79 as if fully set forth herein.  Defendants' acts and/or omissions were a proximate cause of the following injuries suffered by Plaintiffs and decedent:

a. Actual damages;

b. Loss of affection, consortium, comfort, financial assistance, protection, affection and care;

c. Pain and suffering and mental anguish suffered by Clinton Allen prior to his death;

d. Mental anguish and emotional distress suffered by Plaintiffs;

e. Loss of quality of life;

f. Funeral and burial expenses;

g. Loss of service;

h. Loss of earnings and contributions to Plaintiffs;

i. Exemplary and punitive damages as well as reasonable attorneys' fees and costs of court;

j. Pursuant to 42 U.S.C. §1988, and other applicable laws, Plaintiffs should be awarded reasonable attorney's fees for the preparation and trial of this cause of action, and for its appeal, if required;

k. Prejudgment interest; and

l. Post judgment interest.

81.    Plaintiffs seek unliquidated damages in an amount that is within the jurisdictional limits of the court.

## PUNITIVE/EXEMPLARY DAMAGES
## IX

82.     Plaintiffs incorporate by reference paragraphs 1 through 81 as if fully set forth herein.  Additionally and in the alternative, the conduct of Defendant Staller was done with malice.  As such, Plaintiffs request punitive and exemplary damages to deter this type of conduct in the future.  In the alternative, such heedless and reckless disregard of Clinton Allen's rights, safety and welfare is more than momentary thoughtlessness, inadvertence or misjudgment.  Such unconscionable conduct goes beyond ordinary negligence, and as such Plaintiffs request punitive and exemplary damages are awarded against Defendant Staller in a sum which is within the jurisdictional limits of this court.

## COSTS AND ATTORNEY FEES

83.     Plaintiffs incorporate by reference paragraphs 1 through 82 as if fully set forth herein.  Plaintiffs are entitled to an award of attorney fees and costs under 42 U.S.C. § 1988(b) and other applicable provisions or in equity.  As such, Plaintiffs request the Court to award costs and attorney fees incurred in Plaintiffs' prosecution of this litigation.

## JOINT AND SEVERAL LIABILITY

84.     Plaintiffs incorporate by reference paragraphs 1 through 83 as if fully set forth herein.   Plaintiffs  would  show  that  Defendants  were  jointly  and  severally  liable  for  the negligence, which was the proximate cause of Plaintiffs' injuries.

## CONDITIONS PRECEDENT

85.     Plaintiffs reserve their rights to plead and prove the damages to which they are entitled to at the time of trial.  All conditions to Plaintiffs' recovery have been performed or have occurred.

## TRIAL BY JURY

86.     Plaintiffs have paid a jury fee and demands trial by jury.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that Defendants be cited to appear and answer herein; that upon final trial hereof Plaintiffs have and recovers judgment from Defendants; actual damages, exemplary damages, pre-judgment interest at the legal rate; interest on said judgment at the legal rate; costs of court; and such other and further relief, both general and special, at law and in equity, to which Plaintiffs may show himself justly entitled.

Respectfully submitted,

By:  /s/ Daryl K. Washington
DARYL K. WASHINGTON
State Bar No. 24013714
**LAW OFFICE OF DARYL K. WASHINGTON, P.C.**
325 N. St. Paul St., Suite 1975
Dallas, Texas  75201
214 880-4883
214-751-6685 - fax

**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January ____, 2015, the foregoing pleading was filed with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to all attorneys of record who have consented in writing to accept this Notice as service of documents by electronic means.

/s/ Daryl K. Washington
DARYL K. WASHINGTON