

# Affordable Realistic Tactical Training

16705 Fagerquist Road -  Del Valle, Texas  78617
512-247-2731 – office
ARTT645@att.net          ✳          www.ARTT.us

### Expert Witness Report

Daryl K. Washington retained me in April 2016 as an expert witness to give opinions in the case of *Collette L. Flanagan, et al v. City of Dallas, Texas and Clark Staller;* Civil Action No. 3:13-CV-4231-M.

## I.   My Background

1)      My full and complete name is Jerry Ray Staton.  I am currently a resident of Travis County, Texas. I am self-employed. I am the President of Affordable Realistic Tactical Training ("ARTT").  ARTT has provided firearms, combative skills (aka defensive tactics or physical skills), use of force, police procedures, risk management, arrest related death/excited delirium, and TASER training to military, security, and law enforcement officers for the past sixteen (16) years.  I have been recognized as an expert in both state and federal courts on TASER devices, normal police procedures, and use of force including excessive and deadly force.

2)      I am a retired police officer having obtained the rank of Detective with the Austin Police Department.  I started my police career in February 1975 and retired in August 2000.  The majority of my service was spent in the tactical arena, including eight years on a full-time SWAT team.  The last three years of my career I was assigned as an instructor in the Police Academy, teaching use of force skills to cadets and veteran officers. Since retiring, I have continued teaching in the police use of force field on a regular basis, currently accumulating nineteen years of teaching experience and forty-one years of law enforcement related experience.

3)      See attached curriculum vita to establish my background, training, and experience.

4)      See attached list of the cases I have worked on as an expert witness.

5)      See attached fee schedule for this case.



## II.   Materials Reviewed

In developing my opinions, I reviewed the following documents:

01) Plaintiffs' Fourth Amended Complaint

02) Order Denying Motion for Summary Judgment

03) Findings, Conclusions, and Recommendation

04) Initial Dallas Police Department Report

05) City of Dallas' Answers to Plaintiffs' Fourth Amended Complaint

06) Clark Staller's Answers to Plaintiffs' Fourth Amended Complaint

07) Clinton Allen Autopsy Report

08) Affidavit of William P. Flynn

09) Clark Staller's Medical Records

10) City of Dallas' Objections and Responses

11) Defendant's Discovery Objections and Responses

12) Vicki McKnight's Affidavit

13) Ronderaline S. Allen's Affidavit

14) Iva Spears' Affidavit

15) Shaundra Barrett's Affidavit

16) De Andre Williams' Affidavit

17) Nichole Lockett's Affidavit

18) Autopsy Photos

19) Scene Photos

20) SDISC CAPERS Shooting Investigation

21) SDISC CAPERS Offense Report #005628-A

22) Crime Scene Analysis Report

23) SDISC CAPERS Personnel File for Clark B. Staller

24) SDISC CAPERS Recruit Training File

25) SDISC CAPERS Training Log

26) SDISC Internal Affairs Investigation CN-2013-082

27) SDISC Internal Affairs Resume

28) IAD Standard Operation Procedures

29) Public Integrity Unit SOP

30) SDISC CAD Call Sheet

31) SDISC Patrol SOP

32) SDISC General Orders

33) Nine Audio and/or Video CDs

    a. IAD "Interview" Staller Audio File

    b. Audio Interview Witness M. Kelly

    c. Audio Interview Witness M. Kelly (duplicate)

    d. Interview Witness Vicki Simpson Video File

    e. Interview Witness Vicki Simpson (duplicate)

    f. Audio File Consent to Search Vicki Simpson

    g. Video File of the Sgt. Responding to follow up on a Phone Call

    h. 911 & Dispatch Recording

    i. 911 & Dispatch Recording (duplicate)

34) Staller's Deposition Transcript

### III.   Overview/Timeline

1)      On or about March, 10, 2013, Dallas Police Officer Clark Staller ("Staller") responded to a disturbance call at 3303 Southern Oaks Blvd. in Dallas, Texas. The 911 caller, identified as Mandria Kelly ("Kelly"), reported a known black male dressed in all black argued with her, knocked on her door, and refused to leave. There was no evidence of any property damage or a report of anyone being injured. There was also no report that the black male was armed with a weapon. Shortly after arriving at the call Staller, observed an individual later identified as Clinton Allen ("Allen") walking away from building five (5) in the direction of building six (6). Staller confronted Allen and in less than two (2) minutes and thirty eight (38) seconds, fatally shot Allen. One (1) minute and fifty (50) seconds of that time Staller was holding Allen at gunpoint, therefore from the time Staller claimed Allen stood up to the time Staller shot him was forty eight (48) seconds. Staller claimed Allen attacked him and he was in fear for his life.   There is no evidence of Staller being attacked and Staller had no visible injuries to support his story.

2)      According to a computer aided dispatch ("CAD") log produced by the Defendants, and the 911 dispatch audio file, the initial call was received at 00:24:49. A CAD entry at 00:27:33 gave additional but incorrect information[1] that Allen knocked on Kelly's door over sixty (60) times that day and was threatening her. An entry at 00:28:33 reports Kelly was in the apartment with four (4) kids. It is unclear how much of that information was known to Staller by the time he arrived at the call.

3)      At 00:29:00 the call was dispatched. Unit A721 accepted the call with A751 listed as back-up. A supervisor was also assigned to respond. Staller (unit E731) was very close to the call and responded code III (lights and siren). Staller arrived at the complex at 00:29:33. Three minutes later (00:32:39) Staller put out on the air that the suspect was a 5'10 black male, wearing all black clothing and a "do-rag", suspects' first name was Clinton, suspect was on foot in the complex, and should be on some kind of narcotic. At

---

[1] Kelly reported Allen called her over sixty (60) times that day, the dispatcher misquoted the information.

00:33:28 unit E-715 (two man unit) reported to be out with Staller, but in fact they were at building five (5) where the original call was reported and Staller was no longer at that location.

4)    At 00:34:13 Staller broadcasted that he had a suspect at gunpoint. That radio transmission would result in all units in the area running code III to assist.  Synchronizing the audio with the CAD records, Staller arrived at the call, located and talked briefly to Kelly, repeated the suspect's description, observed Allen walking in the area, followed Allen around the corner of building six (6), located Allen in the patio area of building six (6), and gave Allen several verbal commands to show his hands before he made the radio call about holding a suspect at gunpoint. Something less than four (4) minutes and forty (40) seconds after arriving at the complex, Staller was holding Allen at gunpoint and calling for back-up.

5)    One minute and fifty (50) seconds later at 00:36:03, Staller can be heard saying the suspect was not complying, not showing hands but there was never an indication of a fight. There is nothing in the CAD report to verify the exact time Staller shot Allen, but medical units were dispatched by Staller at 00:36:51, therefore, if the request for EMS was due to Allen being shot,  Allen was shot by Staller within forty eight (48) seconds after his comment about Allen not showing his hands. The following events (**according to Staller's version**) would have taken place in those forty eight (48) seconds:

- Staller repeatedly warned Allen to show his hands; (verified by witnesses Simpson)
- Allen stood up and advanced towards Staller; (Staller labeled this active aggression) [2]
- Staller put up his gun and drew his TASER;
- Staller backed away from Allen (verified by witness Simpson)
- Allen closed the distance and grabbed Staller;
- Staller tried to activate the TASER but it failed to function;

---

[2] Active aggression is normally defined as an attack against an officer. What Staller described is at a minimum non-compliance and at most active resistance. Active aggression allows a higher level of force to be used than non-compliance or active resistance.

- Allen continued to "attack" Staller;

- Staller pushed Allen a few inches off and tried the TASER again;

- This time the TASER worked and the cartridge deployed;

- The probes struck Allen but had little or no effect;

- Allen continued to attack Staller;

- Both fell over the rail;

- Both ended up on the ground;

- Both got back up;

- Allen got behind Staller;

- Allen choked Staller from behind, lifting Staller off the ground;

- Allen punched Staller in the head while choking Staller; (not mentioned until Staller's deposition)

- Staller shot Allen repeatedly until his gun jammed; (firing between his left arm and his body)

- Allen continued to choke Staller after being shot seven times; (one round entering Allen's back)

- Allen eventually became weaker and Staller broke free;

- Allen walked off and fell to the ground as back-up officers arrived;

- Shortly after Allen fell, Staller called for EMS.

6)     A vastly different account was given by eyewitness Vicki McKnight-Simpson ("Simpson"). Simpson states she heard Staller yelling at Allen to put his hands up. Hearing the noise, Simpson went to the window and watched the confrontation.  Simpson saw Staller shoot Allen while Allen had his hands up. Simpson stated she did not see Allen exhibit any aggression towards Allen. The distance between the officer

and Allen according to Simpson's first statement was about three (3) or four (4) feet when Staller started shooting. In Simpson's later affidavit, she estimated it could have been as much as five (5) feet. Simpson went on to testify she observed Staller continue to shoot Allen after Allen had fallen to the ground and was no longer resisting. Simpson did not report seeing any physical struggle between Staller and Allen. Simpson did not report seeing the TASER used. Simpson did not report seeing Staller and Allen go to the ground. Simpson did not report seeing Allen choke or punch Staller.

7)      The only evidence that Staller was attacked and later choked by Allen is Staller's own testimony. Staller's complaint of pain and difficulty swallowing could not be verified by medical examination. No injury was found in that examination to suggest Allen lifted Staller off the ground by his neck while applying enough pressure to cut off Staller's ability to breathe. There was no bruising or injuries visible in the photos of Staller taken shortly after the OIS. Staller confirmed at his deposition that no bruising or injuries could be seen on the photos taken immediately after the incident. At the scene when asked if he was injured, Staller stated he was not injured and did not require medical assistance. This was noted and confirmed by Staller at his deposition.

## IV.   Opinion

8)      My opinions in cases such as this one develop out of my knowledge and experience in the applicable fields. Here, my opinions are based on: my own experiences; my education; Texas laws, the International Association of Chiefs of Police ("IACP") Model Policies and Training Guidelines; the Commission on Accreditation for Law Enforcement Agencies ("CALEA"); the Texas Commission on Law Enforcement ("TCOLE") formerly known as TCLEOSE; case law on the relevant topics; as well as opinions in cases such as *Graham v. Conner* and *Tennessee v. Garner*. Based on my knowledge of the above events by examining the items provided for my review along with my knowledge and experience gained from fifteen

(15) years of analyzing police use of force events as an expert, I submit the following observations and opinions.

9)      Giving equal weight to the statements from all parties involved and the physical evidence or lack thereof and based on my experience as a law enforcement expert it is my opinion that the shooting of Allen by Staller did not happen the way Staller described it. The witness statement from Vicki McKnight-Simpson strongly contradicts Staller's version of the events. Simpson says Allen was moving towards Staller when he was shot. Staller was backing up. The lack of gunpowder residue and stippling around Allen's entry wounds along with the entry wound in Allen's back contradicts Staller's description of how the shooting took place.

10)     Staller was previously involved in an incident that resulted in his truthfulness being called into question. In 2011, Staller struck a suspect with his vehicle. The investigation into that event concluded Staller lied about having done so. Lying is one of the cardinal sins for police officers. Staller received a twenty (20) day suspension in that incident but did not receive any additional training to correct his behavior or to investigate his fitness to be a police officer. Being untruthful in an investigation has resulted in termination in many police agencies. Lying places doubt on the officers truthfulness from that day forward. Considering the vast differences between Staller's version of events in this OIS and the sworn testimony from Simpson, along with the forensic evidence in this case, Staller's version of the facts should have been questioned. The investigations into this OIS appear to have taken Staller's word as fact, despite his prior conduct and the contradictory evidence.

11)     Staller responded code III to what most Texas police officers would consider a routine disturbance call requiring a rapid response, but not code III. Responding code III puts citizens at additional risk but also tends to elevate the emotions of the responding officer. Considering how close Staller was to the call, responding code III would have made no difference in his arrival time. After a very brief interview with the

complainant Staller deviated from standard police procedures when he went after Allen on foot without notifying anyone by radio that he had a suspect insight and was leaving the original location without waiting on back-up officers. This became even more relevant when Staller called for assistance and no one knew his exact location. Officers at the complex were frantically trying to locate Staller south of building five (5) when he was behind building six (6). The first back-up unit arrived at the call forty nine (49) seconds after Staller put out the description of Allen and prior to Staller confronting Allen. Not following standard procedure to keep everyone informed of his new location delayed Staller receiving back-up even though officers were in the same complex looking for him. Had Staller followed proper police procedure it is more likely than not Allen would not have been killed by Staller.

12)    Allen was known to Kelly but there was no investigation at the scene to determine what, if any threat Allen posed to Kelly or anyone else. Staller testified at his deposition that he talked to Kelly for five (5) to seven (7) minutes after arriving. The evidence suggests Staller was with Kelly for less than half that time. Staller did not take the time to determine if Kelly had been injured or if there were any laws broken that would require Allen's arrest. Staller's decision to pursue Allen when he did without back-up and without notifying dispatch (or other responding officers) was a major deviation from preferred police practices. Foot chases, even more so by lone officers, are notoriously dangerous and have come under national scrutiny by numerous police practices experts. Many experts conclude the safer approach is to have back-up officers establish a perimeter before searching for the suspect. This works well in large agencies like Dallas where back-up officers are normally available within minutes.

13)    Had Staller followed proper police procedures and transmitted his location and direction of travel saying he was attempting to stop a possible suspect, the responding officers would have been notified Staller was no longer at the original call location. This would have made finding Staller much easier. Staller would have been able to give accurate information on his location as there is little or no stress involved in following

009

a person that may or may not be the person involved in the call. At the time, Staller could not have known the person he was following was Allen, but did know Kelly knew Allen. Staller would have had only a suspicion the person he was about to confront was the person causing the disturbance. Allen was not a threat to anyone and there was no immediate need to confront Allen at that time. In his deposition testimony Staller agreed Allen was not a threat to Kelly when Staller decided to stop Allen.

14)     Another issue that became an important factor in how this call ended was Staller's failure to adequately understand and maintain his TASER conducted electrical weapon ("CEW"). In my opinion, this was a direct result of a lack of adequate training and supervision from the City of Dallas and the Dallas Police Department ("DPD"). The DPD is known to this writer as having a long list of problems with its TASER program when compared with other large police agencies in Texas. Many of the officers with the DPD were known for not wanting to carry CEWs. The DPD had one of the most restrictive CEW policies in the state, which caused further resistance to carrying them. Early in the adoption of CEWs into the DPD, CEW deployments were treated much like an OIS. This created a rift between the administration and many of the street officers over CEWs.

15)     In his deposition Staller confirmed the lack of adequate CEW training when he testified he was first trained as an end-user in 2008. Between his original training and this event in 2013 Staller had not attended any re-certification training. TASER International, Inc. recommends yearly re-certification training for end-users. It had been five (5) years since Staller was certified to carry a TASER. Not having additional refresher training greatly increased the risk of Staller not being confident or competent with the equipment. Staller was unfamiliar with numerous aspects of CEW usage as shown when he testified at his deposition that he did not know anything about downloads, incorrectly defined a follow-up drive stun[3], was

---

[3] A TASER CEW can be utilized three ways, two of which can achieve neuromuscular incapacitation. First deploy the probes with a foot or more of spread, second deploy the probes with less than a foot or more of spread and follow-up with a drive stun without removing the cartridge, and third (will not achieve NMI) remove the cartridge and use the TASER like a stun gun by placing the high voltage end against a person.

unfamiliar with what happened if the CEW had a battery disconnect (which is what the investigation blamed on his TASER failing to function), did not know the difference between a DPM and an XDPM[4], and thought he could achieve NMI (which he described incorrectly) if his target was five (5) feet away, then claimed he did not know the minimum distance but was just guessing. Staller testified he never received the warning from TASER International, Inc. that brief spark tests could result in programming the user to short cycle the TASER[5]. This is more likely than not the reason the TASER download shows only one activation for this event and the time was only one (1) second. Staller did testify he knew a proper spark test should last a full five (5) seconds. However, the download for his CEW indicates he did not spark test his TASER that day for five (5) seconds. The only other activations prior to this event were for two (2) seconds and one (1) second. This lack of training and resulting lack of expertise was most likely the reason the TASER failed to incapacitate Allen and resulted in Staller's decision to use deadly force.

16)      Looking at the download data produced by the City of Dallas, it is undeniable the CEW used by Staller in this officer involved shooting was not well maintained. The frequency and duration of the spark tests are well below what is recommended by the manufacturer. This lack of adequate testing and conditioning could have been the reason the TASER allegedly failed when Staller first attempted to use it against Allen. Another possible explanation was Staller failed to move the safety to the "armed" position. The investigation into this event concluded the problem was a worn gasket between the digital power magazine ("DPM") also known as the battery, and the unit itself. This gasket has nothing to do with the connection and was added to the design to help keep dirt and debris out of the CEW. Again a more likely reason for the CEW to fail can be traced to quality and quantity of training. A TASER CEW will not function if the user failed to move the safety from the safe to the armed position. This normally happens

---

[4] XDPMs are optional and allow for an extra cartridge to be carried on the TASER. This added length that is responsible for some disconnect issues. Over time the connection gets loose from leverage (weight on the extra cartridge).
[5] This is caused by repeatedly moving the safety to the off position right after pulling the trigger, which can become a habit.

when there has not been enough realistic training to engrain this movement into the officer's subconscious memory (often incorrectly referred to as "muscle memory"). There are no documents to indicate the City of Dallas and the DPD provided Staller with adequate CEW training. Staller's testimony confirms just the opposite, that the DPD provided far below the accepted level of training to adequately prepare officers to successfully use TASERs under stressful conditions.

17)     If Staller's version of events about when the CEW failed to stop Allen (the second attempt to use the TASER) are to be believed, they support an additional indication of a less than adequate CEW program. Staller claims he deployed the TASER the second time and it launched the probes but had little or no effect. In addition to the possibility of short cycling the TASER, a well-trained end-user would have recognized the limited distance could also have been the problem due to producing a close probe spread, which is known to be less effective. A clothing disconnect could also have been the issue.  A well trained CEW end-user would have recognized another option would have been a follow-up drive stun in an attempt to achieve neuromuscular incapacitation. Since Staller claims Allen was within contact distance already, the follow-up drive stun would have been an excellent force option. Apparently, Staller did not recognize this, had never been trained on how to do a follow-up drive stun, therefore discarded his TASER and (if Staller is to be believed) the situation later escalated to deadly force after Allen placed Staller in a choke hold.

18)     The investigation into this OIS was conducted by the Dallas Police Department. As is typical in an OIS there were actually two investigations. One was done by the crimes against persons unit ("CAPERS") and a second investigation was conducted by internal affairs ("IA") also known as the public integrity unit. It is my opinion both investigations failed to pursue numerous critical issues.  A major problem was the "so called" IA interview of Officer Staller. The audio recorded interview consisted of having Staller read his initial written report. No questions were asked and none of the critical details from the shooting were clarified. The investigating detective appeared to accept Staller's word for what happened. An impartial or

objective interview cannot be conducted in this manner. For example, Staller was not questioned as to the entry wound in Allen's back. Staller later testified at his deposition that he was unaware Allen was shot in the back and had no idea how that would have happened. Staller testified at his deposition that he was not even informed there was a witness that strongly contradicted his version of events.

19)     Another issue that should have been explained but was left unanswered was revealed in the TASER download, which recorded an activation on 3/10/13 at 00:36:02. This appears to be when the TASER did function but only for one second. Again, this "malfunction" (if it was a malfunction) was attributed to the compressed gasket theory being accepted as fact. A power supply disconnect is one possible explanation for the one second run time but it could also have been caused if the officer moved the safety from armed to off. Again, this would not be uncommon when officers are allowed to routinely do one second or less spark tests, which is seen frequently on the download for the TASER used by Staller. This is another example of "muscle memory" combined with inadequate training producing negative results.

20)     The download of the CEW used by Staller was generated on 3/13/13 at 14:13:29 local time. What was not shown was a spark test at the time of the download to sync the TASER clock with the local time. TASER clocks are known to gain or lose up to several minutes per month. Syncing the device by doing a spark test just before a download is required to get an accurate time. This CEW had not been downloaded for three months. If proper procedures for syncing the TASER clock to the CAD clock were followed, the investigator could have then compared the times from the CAD log and the TASER log to see if the TASER was deployed when Staller said it was. While this method will not result in an exact sync, it would help verify (or dispute) Staller's version of events. Again, it appears the investigators just took Staller's word for what happened as fact and made the decision not to follow proper police procedures.

21)     Statements were taken from other persons in the complex but Simpson was the only actual eyewitness. Nichole Lockett stated she heard the shots and later heard Staller say, "He had a weapon and

I was trying to defend myself". Pastor Iva Spears stated he saw Staller holding a gun on Allen but was in his apartment when the shots were fired. He did say Allen was not showing any signs of aggression towards Staller.

22)     In my opinion and based on my 40 years of law enforcement, educational, teaching, and consulting experience in the area of police practices and procedures, law enforcement and academic experience in homicide investigation, the eye witness statement from Simpson, and the physical evidence in this case, Staller did not shoot Allen while Allen was allegedly choking him from behind. Allen was not standing behind Staller when he was shot. At least some of the rounds were fired when Allen was in front of Staller and at more than contact distance from Staller when he was shot. It is hard to imagine a well-trained and reasonable police officer feeling the necessity to shoot an unarmed person under the same conditions that Staller shot Allen. Furthermore, Staller's deviations from standard police practices on this call were instrumental in the outcome of Allen being shot and killed by Staller. Based on my experience, it is my opinion that Staller was plainly incompetent or knowingly violated the law. The deadly force used by Staller in taking Allen's life was a violation of Allen's Constitutional right to be free from excessive and unnecessary force and any reasonable police officer in Staller's position would have known deadly force was not justified under those circumstances.

23)     The objectively reasonable standard for judging an officer's use of force asks the question, "Could another reasonable officer with similar training and facing similar circumstances believe shooting Allen was lawful and necessary?" In my opinion the answer in this case is no and this use of force does not meet the standard. It is my opinion Staller, without proper provocation used deadly force against Allen, which caused his death. This was a violation of Allen's constitutional right to be free from excessive and unnecessary force.

24)   Plaintiffs also claim the lack of training and supervision from the DPD rose to the level of deliberate indifference. My understanding of deliberate indifference, as taught to police officers in the police academy setting, is as follows:

> *Deliberate Indifference is a form of intentional harm. When the need for more or different training is so obvious, and the inadequacy so likely to result in a violation of constitutional rights, police officers can reasonably be said to have been deliberately indifferent to the safety of the citizen. Deliberate indifference is the conscious or reckless disregard of the consequences of one's acts or omissions. It entails something more than negligence, but is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result. Deliberate indifference is defined as requiring (1) an "awareness of facts from which the inference could be drawn that a substantial risk of serious harm exists" and (2) the actual "drawing of the inference. Deliberate Indifference is the conscious or reckless disregard of the consequences of one's acts or omissions. "*

25)   The International Association of Chiefs of Police (IACP), in an article by Carol Ann Rohr, states, "Failure-to-train liability…can result from a policy if it rises to the level of deliberate indifference. When the need for more or different training is so obvious, and the inadequacy so likely to result in violation of constitutional rights, policymakers can reasonably be said to have been deliberately indifferent to the need."

26)   In that regard, it does not matter if the DPD does or does not have adequate written policy pertaining to the actions of the involved officers. I noted in this case, as is the usual custom and practice of law enforcement agencies, all reported police actions are subject to review and approval up the chain of command. If the actions of line officers are reviewed and accepted by command supervisors, the acceptance amounts to constructive approval of the officers' actions. When police actions violate written policy, the constructive approval overrides written policy and establishes new policy. The failure to take corrective action prior to the injury of Clinton Allen could be seen as an act of deliberate indifference on the part of the DPD for the safety and welfare of Dallas citizens. As previously stated, when a law enforcement agency has knowledge of a violation of written policy and takes no action to correct the breach of policy, there is a

constructive approval of the violation. When that occurs the gross deviation from accepted police practices and procedures rises to the level of substantial, deliberate indifference for the rights and safety of the citizens that police officers are sworn to protect. A review of Staller's training record shows a lack of adequate physical skills training to be a significant part of the reason Staller utilized more force than the situation required. Physical skills are perishable. It has been opined by many use of force experts that yearly hands-on training is necessary to prepare officers to safely handle certain situations. The quality and quantity of training directly reflects on the confidence and competence of an employee. Failure to provide adequate training increases the risk of injuries to both employees and persons they must control. For this reason I find the City of Dallas, through the Dallas Police Department, was instrumental in the chain of events that lead to Allen's death. The City of Dallas, through the Dallas Police Department, failed in its duty to properly train and supervise Staller, and exhibited a deliberate indifference for the rights and well-being of Clinton Allen by allowing a gross deviation from the generally accepted standards of practices and procedures. The gross deviation from accepted practices and procedures by Clark Staller and supervisors rises to the level of substantial, deliberate indifference for the rights and safety of Clinton Allen.

27)     Based on my review of the material provided and my 40 years of experience as a law enforcement officer, I have formed an opinion that Staller's shooting of Clinton Allen for no lawful reason was not an act that a reasonable, well-trained officer, confronting the circumstances as they appeared at the time of the challenged conduct and in light of then-established law, would have believed was constitutional. Staller's acts were in clear violation of Clinton Allen's constitutional rights. Based on the evidence, including the witness statement of McKnight and the deposition testimony of Staller, Clinton Allen did not die instantly and experienced a level of conscious pain and suffering before dying.

28)	All opinions and conclusions expressed above are presented to a reasonable degree of professional certainty and/or probability. I further declare, certify, verify, and state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

29)	This concludes my findings and opinions in this case based on examination of documents to this date. I understand there is a possibility additional information may be revealed through the discovery process. I therefore respectfully reserve the right to modify my opinion based on the receipt and examination of additional information.

Jerry Staton
Force Science Analysis
Certified Litigation Specialist
Owner, Affordable Realistic Tactical Training



**SOUTHWESTERN**
**INSTITUTE OF FORENSIC SCIENCES**
**AT DALLAS**

**Office of the Medical Examiner**

**Autopsy Report**



**Case: IFS-13-04263 - ME**

COPY

DALLAS COUNTY
INSTITUTE OF FORENSIC SCIENCES

**Decedent: Allen, Clinton Roebexar**      25 years Black Male      DOB: 09/29/1987

Date of Death: 03/10/2013 (Actual)
Time of Death: 01:19 AM (Actual)

Examination Performed: 03/10/2013 12:00 PM

---

## ORGAN WEIGHTS:

| | | | | | |
|---|---|---|---|---|---|
| Brain: | 1,420 g | Right Lung | 570 g | Right Kidney: | 160 g |
| Heart: | 350 g | Left Lung: | 560 g | Left Kidney: | 170 g |
| Liver: | 1,880 g | Spleen: | 100 g | | |

---

## EXTERNAL EXAMINATION

The body is identified by the toe tag. Photographs, fingerprints, palmprints and radiographs are taken.

When first viewed, the body is nude. The hands and feet are bagged. No jewelry is present. Three plastic bags accompany the decedent and contain a cut black long-sleeved shirt, a cut gray tanktop, cut blue boxers, one black sock, cut black pants with a cut black belt, a pair of brown shoes, a black wallet, $21 cash, a driver's license (retained and destroyed), a Social Security card (retained and destroyed), miscellaneous papers and cards, a birth certificate, a broken gray metal necklace, a black cell phone in a black cell phone case, two blue and gray plastic bracelets, a black cigarette lighter, and two key chains with multiple keys and multiple tags. The pants pockets contain a $1 bill and a cigarette package containing green leafy plant matter. The personal items are released. The clothing and the cigarette package containing the green leafy plant matter are retained for submission to the Criminal Investigation Laboratory.

The body is that of a well-developed, well-nourished black male whose appearance is compatible with the stated age of 25 years. When nude, he weighs 232 pounds and is 72 inches long. The body is well preserved in the absence of embalming. Rigor mortis is fully-developed, and there is ill-defined, blanching posterior lividity.

The short, curly black scalp hair covers an atraumatic scalp. Facial hair consists of a goatee beard and mustache with short regrowth in the distribution of a full beard. The irides are brown, and the corneae are clear. The teeth are natural and are in good condition.

The neck and chest are normally-formed. The abdomen is soft and flat.

The external genitalia, perineum and anus are unremarkable.

The extremities are normally-formed and symmetrical.

**CONTROL NO.**

**1 3 - 0 8 2**

*Accredited by The National Association of Medical Examiners*

CONFIDENTIAL

ATTACHMENT 34

IFS-13-04263
Allen, Clinton Roebexar



DALLAS COUNTY
INSTITUTE OF FORENSIC SCIENCES

The back is straight.

## IDENTIFYING MARKS AND SCARS

"SHANTAVIA" is tattooed on the lateral right neck and "TaMyrah" is tattooed on the lateral left neck. A ribbon with "COLLETTE" and "214" are tattooed on the ventral right forearm. Hands in prayer is tattooed on the dorsal right forearm and "TAY" and "GODS" are tattooed on the dorsal right wrist. "TEXAS" and "VIOLA" are tattooed on the ventral left forearm. "EST 1987" is tattooed on the ventral left wrist. A cross with "LET GO LET GOD" is tattooed on the dorsal left forearm. "SON" is tattooed on the dorsal left wrist. "I'M TIRED" is tattooed on the dorsal right foot and "ME TOO" is tattooed on the dorsal left foot. A star is tattooed on the lateral right lower leg. An outline of the state of Texas with a "T" is tattooed on the posterior left lower leg.

A transverse, well-healed scar is on the right lower abdomen.

## EVIDENCE OF THERAPY

An endotracheal tube protrudes from the mouth and is secured by adhesive tape over the face. Multiple electrocardiogram lead pads are affixed to the chest and abdomen. An intraosseous catheter protrudes from the anterior right lower leg.

## EVIDENCE OF INJURY

Gunshot wounds:

1. Gunshot wound of right upper chest (GSW #1):

The right upper chest has a 3/8 inch diameter circular gunshot entrance wound near the right clavicle. It is 12-3/4 inches from the top of the head and 2-3/4 inches right of the anterior midline. A circumferential, dry, dark red abrasion rim surrounds the wound, measuring 1/16 of an inch from the 6 o'clock to 12 o'clock position and expanding to 3/8 inch from the 12 o'clock through 6 o'clock position. Multiple fine pinpoint dark red abrasions extend up to 2 inches onto the medial upper chest from the 12 o'clock to 3 o'clock position. No soot surrounds the wound.

After perforating the skin and subcutaneous tissue, the projectile perforates the underlying musculature of the lateral right upper chest before exiting the anterior apex of the right axilla.

The anterior apex of the right axilla has a 1/2 inch diameter circular gunshot exit wound, 2 inches anterior to the axillary midline.

The projectile then re-enters the anteromedial right upper arm through a 3/8 inch diameter circular gunshot re-entry wound, 3/4 inch inferior to the axillary apex along the medial edge of the right upper arm. The gunshot reentry wound is surrounded by a purple ecchymosis that extends 1 inch posteriorly and 2 inches anteriorly.

The projectile perforates the skin, subcutaneous tissue and musculature of the right upper arm, passing anterior to the right humerus before exiting the posterior right upper arm.



## CONTROL NO.
1 3 - 0 8 2

*Accredited by The National Association of Medical Examiners*

CONFIDENTIAL     ATTACHMENT 3 Y



The posterior right upper arm has a 3/8 inch diameter circular gunshot re-exit wound, 2 inches below the top of the right shoulder and 1 inch posterior to the lateral edge of the right upper arm. The wound is surrounded by purple ecchymosis that extends up to 1 inch from the 12 o'clock edge.

The gunshot wound is associated with hemorrhage along the wound track but no other significant neurovascular or bony trauma.

No projectile is recovered.

The wound path is from front to back, left to right, and downward.

II. Gunshot wound of medial left upper chest (GSW #2):

The medial left upper chest has a 3/4 x 1/2 inch oval gunshot entrance wound oriented in the 3 o'clock direction, 13-1/2 inches from the top of the head and 2-3/4 inches left of the anterior midline. A nearly circumferential dark red abrasion is 1/8 inch wide from the 3 o'clock to 5 o'clock position and expands to 3/8 inch wide from the 5 o'clock to 1 o'clock position with sparing of the 1 o'clock to 2 o'clock position. A pink-purple, faint abrasion extends up to 1-3/4 inch onto the medial left upper chest from the 9 o'clock through 1 o'clock position. Few small red abrasions extend a maximum of 1/2 inch from the 3 o'clock through 6 o'clock position. Few larger red abrasions are on the left upper chest, 1 inch from the 1 o'clock position. No soot or stippling surrounds the wound.

After perforating the skin and subcutaneous tissue, the projectile perforates the underlying musculature and enters the left chest cavity through the left second rib anteromedially, creating comminuted fractures. It then continues through the left upper pulmonic lobe, the left lower pulmonic lobe, and into the left back through the eighth intercostal space, striking and fracturing the posterior left eighth and ninth ribs. It then penetrates into the musculature and subcutaneous tissue of the mid-back, coming to rest overlying the tenth thoracic vertebral posterior process.

The gunshot wound is associated with hemorrhage along the wound track, rib fractures and an approximately 200 mL left hemothorax.

A mushroomed, medium-caliber, copper-colored metal jacketed projectile is recovered from the subcutaneous tissue overlying the tenth thoracic vertebra.

The wound path is from front to back, downward, and left to right.

III. Gunshot wound of lateral left upper chest (GSW #3):

The lateral left upper chest has a 3/4 x 1/2 inch oval gunshot entry wound, oriented in the 10 o'clock direction, 13-1/4 inches from the top of the head and 4-1/4 inches left of the anterior midline. A circumferential, dark red abrasion rim surrounding the wound is 1/8 inch wide from the 5 o'clock to 9 o'clock position and expands to 1/4 inch wide from the 9 o'clock to 5 o'clock position. A 1 x 1/16 inch red abrasion, oriented in the 3 o'clock direction, roughly parallels the inferior aspect of the wound, approximately 3/8 inch from the 6 o'clock position. A 1/8 inch circular red abrasion is centered 1-1/8 inch from the 5 o'clock position. A 1/4 inch circular red abrasion is centered 1-1/4 inch from the 4 o'clock position. No soot or stippling surrounds the wound.

After perforating the skin and subcutaneous tissue, the projectile perforates the underlying musculature and passes



**CONTROL NO.**

**1 3 - 0 8 2**

*Accredited by The National Association of Medical Examiners*

CONFIDENTIAL

ATTACHMENT 34



IFS-13-04263

Allen, Clinton Roebexar

**DALLAS COUNTY**
**INSTITUTE OF FORENSIC SCIENCES**

posterior to the left clavicle and superior to the left chest cavity through the subcutaneous tissue and musculature of the left upper chest and left back. It then perforates and fractures the left scapula before continuing through the subcutaneous tissue of the left upper back and exiting.

The left upper back has a 1/4 inch diameter, circular gunshot exit wound, 11 inches from the top of the head and 6 inches left of the posterior midline. A 1/16 inch circumferential pink abrasion rim surrounds the wound.

The gunshot wound is associated with hemorrhage along the wound track and fracture of the left scapula.

No projectile is recovered.

The wound path is from front to back, slightly right to left, and slightly upward.

IV. Gunshot wound of lateral left mid-chest (GSW #4):

The lateral left mid-chest has a 1 x 1/2 inch, oval gunshot entrance wound, oriented in the 11 o'clock direction, 16-3/4 inches from the top of the head and 7-1/2 inches left of the anterior midline. A 3/8 inch, dark red abrasion extends from the 3 to 4 o'clock positions. A circumferential dark red abrasion rim is 1/8 inch wide from the 12 o'clock to 2 o'clock position and expands to 1/4 inch wide from the 4 o'clock to 12 o'clock position. A pink--purple contusion extends up to 3/4 inch from the 9 o'clock to 11 o'clock position onto the left chest. Few, sparse, dark red, pinpoint abrasions overlie the contusion. A pink-purple contusion extends 7/8 inch from the 3 o'clock to 4 o'clock position onto the left flank. A 1/4 inch wide, 1-1/4 inch diameter, arching, semicircular pink-purple contusion is 1 inch from the 7 o'clock position on the lateral left chest. No soot or stippling surrounds the wound.

After perforating the skin and subcutaneous tissue, the projectile perforates the underlying musculature of the lateral left chest, grazes the left sixth rib creating comminuted fractures and exits the left mid-back, without entering the left chest cavity

The left mid-back has a 5/8 x 3/8 inch gunshot exit wound, oriented in the 2 o'clock position, 14-1/4 inches from the top of the head and 7-1/2 inches left of the posterior midline.

No projectile is recovered.

The gunshot wound is associated with fracture of the left sixth rib with surrounding subpleural hemorrhage as well as hemorrhage along the wound track.

The wound path is from front to back and slightly upward, with no horizontal deviation.

V. Gunshot wound of left upper abdomen (GSW #5):

The left upper abdomen has a 1/2 inch diameter circular gunshot entrance wound, 23 inches from the top of the head and 3-1/8 inches left of the anterior midline. The wound is surrounded by an irregular pink to dark red abrasion, measuring 1/8 inch from the 1 o'clock to 3 o'clock position and expanding up to 5/8 inch at the 8 o'clock to 9 o'clock position. Dense, confluent, pinpoint red abrasions encircle the wound and become less dense over the medial abdomen, extending up to 1/8 inch from the 10 o'clock to 4 o'clock position, 3/8 inch from the 4 o'clock to 7 o'clock position and 1 inch from the 7 o'clock to 10 o'clock position. A faint pink contusion extends up to 1-1/8 inch from the 1 o'clock



**CONTROL NO.**

**1 3 - 0 8 2**   *Accredited by The National Association of Medical Examiners*



Allen, Clinton Roebexar

DALLAS COUNTY
INSTITUTE OF FORENSIC SCIENCES

position onto the lateral left upper abdomen. Soot is deposited on the 1 o'clock to 4 o'clock edge.

After perforating the skin and subcutaneous tissue, the projectile perforates the underlying musculature of the anterior abdominal wall, enters the abdominal cavity, perforates several loops of small intestine and the small intestine mesentery before entering the retroperitoneal perivesicular soft tissue, grazing the anterior-inferior edge of the medial sacrum and penetrating and coming to rest within the deep muscle of the right buttock.

An intact, medium-caliber, copper-colored metal jacketed projectile is recovered from the deep muscle of the right buttock.

The gunshot wound is associated with hemorrhage along the wound track, spillage of small intestine contents into the peritoneal cavity, graze-type fracture of the sacrum and soft tissue hemorrhage of the retroperitoneum.

The wound path is from front to back, left to right and downward.

VI.  Gunshot wound of left upper arm (GSW #6):

The anterior left upper arm has a 3/8 inch diameter circular gunshot entrance wound, 7-1/2 inches from the top of the left shoulder and 2 inches anterior to the lateral edge of the left upper arm. A circumferential dark red abrasion surrounds the wound, measuring 1/16 inch wide from the 7 o'clock to 12 o'clock position and 1/8 inch wide from the 5 o'clock through 7 o'clock position. A 3/8 inch long, partial-thickness laceration extends from the 1 o'clock to 2 o'clock position. Sparse, fine, pinpoint red abrasions extend up to 1 inch from the 7 o'clock position and 1-1/2 inch from the 12 o'clock position. No soot surrounds the wound.

After perforating the skin and subcutaneous tissue, the projectile perforates the musculature of the left upper arm, passing laterally to the left humerus and exiting the posterior left upper arm.

The posterior left upper arm has a 3/8 x 1/4 inch, oval gunshot exit wound oriented in the 11 o'clock direction, 1-1/2 inch from the top of the left shoulder and 2 inches posterior to the lateral edge of the left upper arm. The wound is surrounded by purple ecchymoses.

The gunshot wound is associated with hemorrhage along the wound track, without significant neurovascular or bony injuries.

No projectile is recovered.

The wound path is from front to back and upward, with no horizontal deviation.

VII.  Gunshot wound of back (GSW #7):

The left lateral mid-back has a 1/4 inch circular gunshot entry wound, 20-3/4 inches from the top of the head and 6-3/4 inches left of the posterior midline. The subcutaneous tissue on the 6 o'clock to 12 o'clock position has a 3/4 inch graze-type red abrasion. A 1/2 inch wide, circumferential pink abrasion surrounds the wound. Thin soot eccentrically surrounds the wound, extending 1/16 inch onto the 6 o'clock to 11 o'clock position and expanding to 1/2 inch onto the 1 o'clock to 5 o'clock position. A faint pink and purple contusion extends up to 2 inches onto the lateral back from the 6 o'clock to 11 o'clock position. No stippling surrounds the wound.



CONTROL NO.

1 3 - 0 8 2

Accredited by The National Association of Medical Examiners

CONFIDENTIAL



COPY

DALLAS COUNTY
INSTITUTE OF FORENSIC SCIENCES

After perforating the skin, the projectile continues superficially through the subcutaneous tissue of the mid-back without striking any bony structures or entering the peritoneal cavity before exiting the right back.

The medial right mid-back has a 1/4 inch circular gunshot exit wound 22 inches from the top of the head and 1-3/4 inch right of the posterior midline. An eccentric, circumferential pink abrasion is 1/16 inch wide from the 6 o'clock to 12 o'clock position and expands up to 5/8 inch from the 12 o'clock to 6 o'clock position. Faint pink ecchymosis surrounds the wound.

The gunshot wound is associated with hemorrhage along the wound track, without significant neurovascular or bony injuries.

No projectile is recovered.

The wound path is from left to right and slightly downward with no significant anterior-posterior deviation.

Other injuries:

The left periorbital soft tissues have purple ecchymosis. The left medial bulbar conjunctivae have subconjunctival hemorrhages. The dorsal edge of the nose has a 1/2 x 1/2 inch faint purple contusion. The left chin has a 3/4 x 1/2 inch red abrasion. The medial left upper lip has a 1/4 x 1/8 inch laceration at the vermillion border. The medial right lower lip has a 1/2 x 1/4 inch laceration surrounded by a purple contusion at the vermillion border. The left central maxillary incisor is fractured and loose with hemorrhage within the alveolar socket. The medial outer right upper lip has a 1/2 x 1/2 inch red abrasion.

The subscalpular tissues are unremarkable. The skull is intact. There are no intracranial hemorrhages. The brain is grossly free of trauma.

The anterior right shoulder has a 1/2 x less than 1/16 inch linear red abrasion in close approximation to a pair of 1/4 x 1/4 inch red abrasions.

The anterior distal right upper arm has a 3/8 x 1/16 inch red abrasion near the antecubital fossa. The posterior right elbow has a 3/8 inch circular red abrasion. The proximal dorsal right forearm has a pair of 1/4 inch diameter circular red abrasions. The posterior left upper arm has a 1-1/2 x 1 inch purple contusion. The anterior right knee has a 5/8 x 1/16 inch horizontal red abrasion.

Clothing: The long-sleeved black shirt is wet and has multiple defects, centered mostly on the right front shoulder, the medial right upper front, the left medial upper front, and the anterior left shoulder. Other defects are on the posterior left shoulder area, the posterior right shoulder area, and across the posterior mid-back area. Two copper-colored metal barbs with connected copper-colored metal wires are embedded in the anterior right shoulder and anterior right upper arm area. The gray tanktop undershirt is wet and has multiple defects as well.

SPECIAL PROCEDURES

An anterior layerwise neck dissection fails to reveal any soft tissue hemorrhage or prevertebral fascia trauma. The hyoid bone and laryngeal cartilages are intact. The lumen of the larynx is not obstructed and the cervical spine is not fractured



CONTROL NO

13-082

*Accredited by The National Association of Medical Examiners*

CONFIDENTIAL

ATTACHMENT 34



Allen, Clinton Roebexar

DALLAS COUNTY
INSTITUTE OF FORENSIC SCIENCES

or dislocated.

The bony prominences of both wrists are incised and fail to show any soft tissue hemorrhage or other evidence of trauma.

The testes are extracted from the scrotum and incised to reveal no evidence of trauma.

EVIDENCE SUBMITTED

The following items are collected, sealed within appropriately-labeled containers, and submitted to the Criminal Investigation Laboratory:

- Clothing
- Bags from hands
- Bags from feet
- Blood standard
- Hair standard
- Nail clippings from both hands
- Gunshot residue kit
- Projectile from back
- Projectile from right buttock.

INTERNAL EXAMINATION

BODY CAVITIES: See EVIDENCE OF INJURY. The thoracic and abdominal organs are in their normal anatomic positions. The body cavities contain no adhesions. The right chest cavity and pericardial cavity contain no abnormal collections of fluid.

HEAD: See EVIDENCE OF INJURY. The scalp, subscalpular area, and skull are unremarkable. The dura and dural sinuses are unremarkable. There are no epidural, subdural or subarachnoid hemorrhages. The leptomeninges are thin and delicate. The cerebral hemispheres are symmetrical, with an unremarkable gyral pattern. The cranial nerves and blood vessels are unremarkable. Sections through the cerebral hemispheres, brainstem, and cerebellum are unremarkable. There are no hemorrhages in the deep white matter or the basal ganglia. The cerebral ventricles contain no blood. The spinal cord, as viewed from the cranial cavity, is unremarkable.

NECK: The soft tissues and prevertebral fascia are unremarkable. The hyoid bone and laryngeal cartilages are intact. The lumen of the larynx is not obstructed.

CARDIOVASCULAR SYSTEM: The intimal surface of the abdominal aorta is free of significant atherosclerosis. The aorta and its major branches and the great veins are normally distributed and unremarkable. The pulmonary arteries contain no thromboemboli. The pericardium, epicardium, and endocardium are smooth, glistening, and unremarkable. There are no thrombi in the atria or ventricles. The foramen ovale is closed. The coronary arterial system is free of significant atherosclerosis. The atrial and ventricular septa are intact. The cardiac valves are unremarkable. The myocardium is dark red-brown and firm, and there are no focal abnormalities.

RESPIRATORY SYSTEM: See EVIDENCE OF INJURY. The upper airway is unobstructed. The laryngeal mucosa



CONTROL NO

13-082

*Accredited by The National Association of Medical Examiners*

CONFIDENTIAL

ATTACHMENT 34

024



IFS-13-04263

Allen, Clinton Roebexar

DALLAS COUNTY
INSTITUTE OF FORENSIC SCIENCES

Page 8 of 13

is smooth and unremarkable, without petechiae. The pleural surfaces are smooth and glistening where intact. The major bronchi are unremarkable. Sectioning of the lungs discloses a dark red-blue, moderately congested parenchyma where not traumatized.

HEPATOBILIARY SYSTEM:   The liver is covered by a smooth, glistening capsule. The parenchyma is dark red-brown and moderately congested. The gallbladder contains approximately 10 mL of dark green bile, and multiple irregular yellow calculi.

GASTROINTESTINAL SYSTEM:  See EVIDENCE OF INJURY. The esophageal mucosa is gray, smooth, and unremarkable. The stomach contains approximately 20 mL of thin brown fluid. There are no tablets or capsules. The gastric mucosa has normal rugal folds, and there are no ulcers. The small intestine is unremarkable externally where not traumatized. The large intestines are unremarkable externally. The appendix is absent. The pancreas is unremarkable externally and upon sectioning.

GENITOURINARY SYSTEM: The capsules of both kidneys strip with ease to reveal smooth and slightly lobulated surfaces. The cortices are of normal thickness, with well-demarcated corticomedullary junctions. The calyces, pelves, and ureters are unremarkable. The urinary bladder contains no urine. The mucosa is gray, smooth, and unremarkable. The prostate gland is unremarkable externally and upon sectioning.

ENDOCRINE SYSTEM:  The thyroid and adrenal glands are unremarkable externally and upon sectioning.

LYMPHORETICULAR SYSTEM:  The spleen is covered by a smooth, blue-gray, intact capsule. The parenchyma is dark red.  The cervical, hilar, and peritoneal lymph nodes are unremarkable.

MUSCULOSKELETAL SYSTEM:   See EVIDENCE OF INJURY. The clavicles and sternum are not fractured.  The diaphragm is intact.


TOXICOLOGY:

Evidence Submitted:
     The following items were received by the Laboratory from the Office of the Medical Examiner:
          015: Biohazard Bag
          015-001: Blood, femoral - gray top tube
          015-002: Blood, femoral - gray top tube
          015-003: Blood, femoral - gray top tube
          015-004: Blood, femoral - gray top tube
          015-005: Blood, femoral - red top tube
          015-006: Vitreous - red top tube
          015-007: Skeletal muscle - plastic tube



CONTROL NO.

13-082

*Accredited by The National Association of Medical Examiners*

CONFIDENTIAL

ATTACHMENT 34

025

IFS-13-04263

Allen, Clinton Roebexar

COPY

DALLAS COUNTY
INSTITUTE OF FORENSIC SCIENCES

**Blood, postmortem**

**Acid/Neutral Screen (GC/MS)**
negative (015-001)

**Alcohols/Acetone (GC)**
negative (015-002)

**Alkaline Quantitation (GC, GC/MS)**
0.38 mg/L phencyclidine (015-001)

**Marihuana/Cannabinoids (LC/MS)**
4 ng/mL tetrahydrocannabinol (015-002)
13 ng/mL carboxytetrahydrocannabinol (015-002)

**Vitreous**

**Alcohols/Acetone (GC)**
negative (015-006)



**CONTROL NO.**

**13 - 0 8 2**

*Accredited by The National Association of Medical Examiners*

CONFIDENTIAL

ATTACHMENT 34

026

IFS-13-04263

Allen, Clinton Roebexar



DALLAS COUNTY
INSTITUTE OF FORENSIC SCIENCES

FINDINGS:

I. Gunshot wound of right chest (GSW #1):

    A. Enters right upper chest.
    B. Medium-range firing (stippling).
    C. Exits right axilla and re-enters medial right upper arm.
    D. Re-exits posterior right upper arm.
    E. Injures musculature of right chest and right upper arm.
    F. No projectile recovered.
    G. Path: front to back, left to right and downward.

II. Gunshot wound of medial left upper chest (GSW #2):

    A. Enters medial left upper chest.
    B. Indeterminate range of firing (no soot or stippling).
    C. Fractures ribs and injures lung.
    D. Projectile recovered from mid-back.
    E. Path: front to back, downward and left to right.

III. Gunshot wound of lateral left upper chest (GSW #3):

    A. Enters lateral left upper chest.
    B. Indeterminate range of firing (no soot or stippling).
    C. Fractures left scapula and injures muscle of left chest and left back.
    D. Exits left upper back.
    E. No projectile recovered.
    F. Path: front to back, slightly right to left, and slightiy upward.

IV. Gunshot wound of lateral left chest (GSW #4):

    A. Enters lateral left chest.
    B. Indeterminate range of firing (no soot or stippling).
    C. Injures subcutaneous tissue of left chest and fractures rib.
    D. Exits left mid-back.
    E. No projectile recovered.
    F. Path: front to back, and slightly upward, with no horizontal deviation.

V. Gunshot wound of left upper abdomen (GSW #5):

    A. Enters left upper abdomen.
    B. Close-range firing (stippling and soot deposition).
    C. Injures small bowel, small bowel mesentery, retroperitoneal soft tissue and sacrum.
    D. Projectile recovered from right buttock.
    E. Path: front to back, left to right and downward.

VI. Gunshot wound of left upper arm (GSW #6):



CONTROL NO

13-082

*Accredited by The National Association of Medical Examiners*



CONFIDENTIAL

ATTACHMENT 34

027

IFS-13-04263

Allen, Clinton Roebexar



COPY

DALLAS COUNTY
INSTITUTE OF FORENSIC SCIENCES

A. Enters anterior left upper arm.
B. Medium-range firing (stippling).
C. Injures musculature of left upper arm.
D. Exits posterior left upper arm.
E. No projectile recovered.
F. Path:  front to back and upward, with no horizontal deviation.

VII. Gunshot wound of back (GSW #7):

A. Enters lateral left mid-back.
B. Close-range firing (soot deposition).
C. Injures subcutaneous tissue.
D. Exits medial right mid-back.
E. No projectile recovered.
F. Path:  left to right and slightly downward, with no anterior-posterior deviation.

VIII. Abrasions and contusions of face, arms and right leg.

IX. Abrasions of lateral right chest and right arm associated with Taser:

A. Taser barbs in clothing.

X. Reportedly Tasered and then shot by law enforcement officer during a struggle.

XI. Reportedly appeared to be under the influence of intoxicating substance(s):

A. Phencyclidine and metabolites of marijuana detected in blood.

**CONCLUSIONS:**

After a review of the autopsy findings and the available investigative information, it is my opinion that Clinton Roebexar Allen, a 25-year-old man, died as a result of multiple gunshot wounds.

**MANNER OF DEATH:**      Homicide

04/04/2013

William McClain, M.D.

Medical Examiner



**CONTROL NO**

1 3 - 0 8 2

*Accredited by The National Association of Medical Examiners*

CONFIDENTIAL

ATTACHMENT 34

028

**IFS-13-04263**
Allen, Clinton Roebexar


DALLAS COUNTY
INSTITUTE OF FORENSIC SCIENCES

04/04/2013

Stephanie Burton, M.D.
Medical Examiner



04/04/2013

Tracy Dyer, M.D., J.D.
Medical Examiner

04/08/2013

Chester Gwin, M.D.
Medical Examiner



04/09/2013

Keith Pinckard, M.D., Ph.D.
Medical Examiner

04/04/2013

Reade Quinton, M.D.
Medical Examiner

04/04/2013

Lynn Salzberger, M.D.
Medical Examiner



**CONTROL NO**

**1 3 - 0 8 2**

*Accredited by The National Association of Medical Examiners*

CONFIDENTIAL

ATTACHMENT 34
029

IFS-13-04263

Allen, Clinton Roebexar

COPY

DALLAS COUNTY
INSTITUTE OF FORENSIC SCIENCES

04/04/2013

Janis Townsend-Parchman, M.D.
Medical Examiner

04/04/2013

Jill Urban, M.D.
Medical Examiner

04/04/2013

Joni L McClain, M.D.
Deputy Chief Medical Examiner

04/06/2013

Jeffrey Barnard, M.D.
Director and Chief Medical Examiner



CONTROL NO.

1 3 - 0 8 2

*Accredited by The National Association of Medical Examiners*

CONFIDENTIAL         ATTACHMENT 34

030

THE SOUTHWESTERN INSTITUTE OF FORENSIC SCIENCES
AT DALLAS

Name _Clinton Allen_     DALLAS COUNTY     Case No. _IFS-13-4263_

INSTITUTE OF FORENSIC SCIENCES

Age _____     Date _03/10/2013_

External Injuries
Page 1 of 1





**SOUTHWESTERN**
**INSTITUTE OF FORENSIC SCIENCES**
**AT DALLAS**

2355 North Stemmons Freeway
Dallas, Texas 75207

Telephone: 214-920-5900
Fax: 214-920-5813

## Test Report - Range of Fire Analysis

| | |
|---|---|
| **Report Date:** | April 01, 2013 |
| **Laboratory #:** | IFS-13-04263-0013 |
| **Agency #:** | 56628A - Dallas Police Department |
| **Requested by:** | Dallas Police Department |
| | Crimes Against Persons Division |
| | Jack Evans Police Building |
| | 1400 S. Lamar |
| | Dallas, TX 75215-1815 |
| **Offense:** | Homicide |
| **Complainant(s):** | Clinton Roebexar Allen |

### Evidence Submitted:

The following evidence was received by the laboratory from the Dallas Police Department:

    016-005: Four Winchester brand 357 Sig caliber unfired cartridges

    016-013: One Sig Sauer, model P226, 357 Sig caliber semiautomatic pistol, serial number U829816

    016-015-001: Nine Winchester brand 357 Sig caliber unfired cartridges

The following evidence was submitted by the Dallas County Medical Examiner's Office:

    003-001: One pair of brown athletic shoes

    003-002: One black sock

    003-003: One pair of blue plaid boxer shorts

    003-004: One pair of black jeans with belt

    003-005: One gray tank top

    003-006: One black long-sleeved thermal shirt

### Results & Conclusions:

The above listed clothing items were examined for the presence of bullet defects and gunshot residue using visual, microscopic, and chemical techniques. No apparent bullet defects were observed in the shoes, the sock, the boxer shorts, the jeans, or the belt. Defects were observed to the tank top; however, as the tank top was likely an underlying layer, no further analyses were performed.

The item 016-013 pistol was test fired using two cartridges from item 016-005 and all nine cartridges from item 016-015-001. Test fires were performed at known distances. Using data from these test fires, muzzle-to-garment distances were determined for those defects surrounded by gunshot residues. Muzzle-to-garment distances were not determined for apparent bullet defects.

A large bullet defect (Hole A) was observed to the upper left chest of the thermal shirt. Nitrite residue and vaporous lead residue were observed surrounding Hole A. The range of fire is greater than or equal to contact to less than twenty-four inches.

A bullet defect (Hole B) was observed to the upper center chest of the thermal shirt. A flake of gunpowder, nitrite residue, and vaporous lead residue were observed surrounding Hole B. The range of fire is greater than contact to less than twenty-four inches.

A linear series of bullet defects (Series C) was observed to the upper right chest of the thermal shirt. Nitrite



Page 1 of 3

IFS-13-04263-0013
April 01, 2013

residue was observed surrounding Series C. The range of fire is greater than nine inches to less than thirty-six inches.

A bullet defect (Hole D) was observed to the upper right shoulder near the collar of the thermal shirt. Nitrite residue was observed surrounding Hole D. The range of fire is greater than nine inches to less than forty-eight inches.

An apparent bullet defect (Hole E) was observed to the upper back of the right sleeve of the thermal shirt. No gunshot residue was observed surrounding Hole E.

An apparent bullet defect (Hole F) was observed to the mid right back of the thermal shirt. One nitrite reaction was observed near Hole F. This reaction may have been due to the proximity of Hole H.

An apparent bullet defect (Hole G) was observed to the mid center back of the thermal shirt. A bullet defect (Hole H) was observed to the mid center back of the thermal shirt just left of Hole G. Nitrite residue was observed between Holes G and H. Vaporous lead residue was observed at the perimeter of Hole H. The range of fire for Hole H is greater than or equal to contact to less than eighteen inches.

An apparent bullet defect (Hole I) was observed to the mid center back of the thermal shirt approximately six inches above Hole H. One lead particulate reaction was observed near Hole I.

A bullet defect (Hole J) was observed to the mid left back of the thermal shirt. A bullet defect (Hole K) was observed to the mid left back of the thermal shirt just left of Hole J. Vaporous lead residue was observed surrounding both Holes J and K. The range of fire for both Holes J and K is greater than or equal to contact to less than eighteen inches. Holes H, J, and K could have possibly all been created by the passage of a single projectile.

An apparent bullet defect (Hole L) was observed to the mid left back of the thermal shirt. An apparent flake of gunpowder was observed near Hole L.

An apparent bullet defect (Hole M) was observed to the top of the left sleeve of the thermal shirt near the shoulder seam. An apparent bullet defect (Hole N) was observed to the left sleeve of the thermal shirt to the left of Hole M. Nitrite residue was observed at these defects.

Apparent medical personnel cuts were observed to the front of the thermal shirt. The cut traversing through the front left side of the shirt was examined for gunshot residue. Although no distinct defect was observed, nitrite residue and vaporous lead residue were observed to the area that would have been the left abdominal area of the thermal shirt. These findings are consistent with a firearm having discharged at a distance of greater than or equal to contact to less than eighteen inches from that area of the shirt.

**Disposition of Evidence:**
The above listed items of evidence will be released to the Dallas Police Department.

033

IFS-13-04263-0013
April 01, 2013

In the event that additional analysis is required, please contact the laboratory.

April Stowe, M.S.F.S.
Firearms Examiner
Phone: 214-920-5975
Email: April.Stowe@dallascounty.org

Page 3 of 3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

```
COLLETTE FLANAGAN,              *
Individually and on behalf of  *
the Estate of CLINTON ALLEN,   *  CIVIL ACTION NO.
Deceased, and RONDERALINE S.   *
ALLEN, Individually,           *  3:13-CV-4231-M
               Plaintiffs,     *
                               *
v.                             *
                               *
THE CITY OF DALLAS, TEXAS and  *
CLARK STALLER,                 *
               Defendants.     *
```

---

ORAL AND VIDEOTAPED DEPOSITION OF

JERRY R. STATON

September 22, 2016

---

ORAL AND VIDEOTAPED DEPOSITION OF JERRY R. STATON, produced at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on the 22nd day of September, 2016 from 12:02 p.m. to 6:44 p.m., before Lydia L. Edwards, CSR in and for the State of Texas, reported by machine shorthand, at the Hilton-Austin Airport Hotel, 9515 Hotel Drive, Austin, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

```
1                    A P P E A R A N C E S
2      FOR THE PLAINTIFFS:
3      Mr. Daryl K. Washington
       WASHINGTON LAW FIRM, P.C.
4      325 North St. Paul
       Suite 3950
5      Dallas, Texas  75201
       214.880.4883
6      214.751.6685 Fax
       dwashington@dwashlawfirm.com
7
8      FOR THE DEFENDANTS:
9      Mr. Jason G. Schuette
       DALLAS CITY ATTORNEY'S OFFICE
10     1500 Marilla Street
       Suite 7BN
11     Dallas, Texas  75201
       214.670.1236
12     214.670.0622 Fax
       jason.schuette@dallascityhall.com
13
14     THE VIDEOGRAPHER:
15     Mr. Doug Haynie
16
17
18
19
20
21
22
23
24
25
```

```
              1              (The reading of Rule 30(b)(5)(a) by the
              2    court reporter was waived by agreement of the parties.)
12:01:49      3              THE VIDEOGRAPHER:  This is Doug Haynie
12:01:50      4    with Continental Court Reporters.  This is the
12:01:53      5    video-recorded deposition of Jerry Staton taken in the
12:01:58      6    matter of Collette Flanagan, et al vs. The City of
12:02:01      7    Dallas, Texas and Clark Staller.  The cause number is
12:02:03      8    3:13-CV-4231-M in the United States District Court,
12:02:09      9    Northern District of Texas, Dallas Division.  The date
12:02:13     10    is September 22nd, 2016.  The time is 12:02 p.m., and
12:02:18     11    we're now on the record.
12:02:19     12              If the attorneys attending this deposition
12:02:21     13    will please announce their names on the record?
12:02:25     14              MR. SCHUETTE:  Jason Schuette, assistant
12:02:27     15    city attorney, appearing on behalf of the Defendants.
12:02:30     16              MR. WASHINGTON:  Daryl Washington on
12:02:32     17    behalf of the Plaintiffs.
             18              THE REPORTER:  Would you raise your right
             19    hand, please?
             20              (At this time, the witness was placed
             21              under oath by Lydia L. Edwards, Court
12:02:42     22              Reporter.)
12:02:42     23              MR. SCHUETTE:  Good morning, Mr. Staton.
12:02:45     24              THE WITNESS:  Good morning.
             25
```

03:36:50  1  scope of this witness' expertise.

03:36:53  2     A.   It's situational.  You know, I have interviewed

03:36:57  3  enough witnesses to know that some people immediately

03:37:01  4  after an event are still in shock, and their initial

03:37:05  5  recollection is not as good as it is within, say, a 24-,

03:37:10  6  36-hour period after they've had a couple of sleep

03:37:16  7  cycles.  So it's really too individualized and

03:37:17  8  situational to give you a definitive answer.

03:37:20  9     Q.   (BY MR. SCHUETTE)  Well, you wouldn't be

03:37:21 10  particularly surprised, then, say, if a police officer

03:37:24 11  immediately after a shooting event recalled having fired

03:37:29 12  four shots when, in fact, the officer fired, say, seven?

03:37:35 13               MR. WASHINGTON:  Objection; calls for

03:37:36 14  speculation.

03:37:37 15     A.   Wouldn't surprise me, no.

03:37:39 16     Q.   (BY MR. SCHUETTE)  Pretty common for police

03:37:42 17  officers in the immediate aftermath of a high-stressed

03:37:46 18  event at an officer-involved shooting to not correctly

03:37:49 19  recall things such as how many shots were fired?

03:37:53 20               MR. WASHINGTON:  Objection; calls for

03:37:54 21  speculation.

03:37:54 22     A.   I agree with your statement.

03:37:57 23     Q.   (BY MR. SCHUETTE)  I'd like to apply some of

03:38:05 24  what we've been talking about to this case, and I'm

03:38:08 25  going to give you a fact scenario.  I would like you to

03:38:14  1  answer without making any credibility assessments, okay?

03:38:18  2          MR. WASHINGTON:  Objection to sidebar.

03:38:20  3      Q.   (BY MR. SCHUETTE)  Does that make sense what

03:38:23  4  I'm asking?

03:38:23  5      A.   Yes.  I'm supposed to take your statements as

03:38:27  6  accurate.

03:38:27  7      Q.   Yes.  I want you to assume as true a certain

03:38:31  8  set of facts and then not to worry about whether you

03:38:34  9  agree or disagree with the facts, just taking the facts

03:38:38 10  as presented, and I want to see what your opinion is

03:38:41 11  based on those facts.  Does that make sense?

03:38:43 12          MR. WASHINGTON:  Objection to the sidebar.

03:38:45 13      A.   I'll try.

03:38:46 14      Q.   (BY MR. SCHUETTE)  Okay.  I want you to assume

03:38:49 15  that Officer Staller received an emergency disturbance

03:38:55 16  call over his patrol car's radio, all right?

03:38:58 17          MR. WASHINGTON:  Objection to the

03:39:00 18  hypothetical.

03:39:01 19      A.   Yes.

03:39:01 20      Q.   (BY MR. SCHUETTE)  I want you to assume that

03:39:03 21  Officer Staller's mobile data terminal informed him that

03:39:07 22  the suspect of the emergency disturbance call was an

03:39:13 23  African-American Black male wearing all black clothing,

03:39:18 24  wearing a black wave cap and that the suspect had been

03:39:23 25  arguing with the 9-1-1 caller, had telephoned the caller

03:39:26  1  over 60 times a day, was knocking on her door and

03:39:30  2  refusing to leave, was banging on her door and was

03:39:33  3  threatening her and that she had acquired a knife, okay?

03:39:37  4      A.   And he knows all of this?

03:39:39  5      Q.   Yes.

03:39:40  6              MR. WASHINGTON:  Again, I'm going to

03:39:42  7  object to the hypothetical.

03:39:45  8      Q.   (BY MR. SCHUETTE)  I want you to assume that

03:39:47  9  there were four children inside the 9-1-1 caller's

03:39:50 10  apartment.

03:39:51 11              MR. WASHINGTON:  Is that a question?  Is

03:39:52 12  that a question, Jason?

03:39:54 13              MR. SCHUETTE:  Mr. Washington, if you --

03:39:56 14              MR. WASHINGTON:  Is it a question?  That

03:39:57 15  was -- that's --

03:39:58 16              MR. SCHUETTE:  No.  You're interrupting my

03:40:00 17  question.

         18              MR. WASHINGTON:  No.

03:40:00 19              MR. SCHUETTE:  I am giving this witness a

03:40:02 20  series of facts that I want him to base an opinion on.

03:40:06 21  The question is coming.

03:40:08 22              MR. WASHINGTON:  Objection to the sidebar.

03:40:10 23  Ask the question.

03:40:15 24              MR. SCHUETTE:  And I'm interrupting to

03:40:17 25  your interrupting my deposition.  I am further objecting

03:40:19  1  to your constant repetition of improper objections which

03:40:23  2  are hindering the course of this deposition.  I have not

03:40:25  3  mentioned it so far, but if it continues, I will have to

        4  seek the Court's ruling on this before the next

        5  deposition.

03:40:28  6                MR. WASHINGTON:  We can have the court

03:40:30  7  reporter certify it, and we can also say that the scope

03:40:32  8  of your questions are exceeding the expertise of this

03:40:37  9  expert.  And you also know that this expert will not be

03:40:40 10  responding at trial to hypotheticals.

03:40:45 11                MR. SCHUETTE:  Well, we'll see about that.

03:40:47 12                MR. WASHINGTON:  That's fine.

03:40:48 13     Q.  (BY MR. SCHUETTE)  Have you lost track now of

03:40:50 14  where we are now on the list of information?

03:40:53 15     A.  I think we are reciting the facts that you're

03:40:56 16  telling me that Staller knew at the time that he got

03:40:59 17  there --

03:41:01 18     Q.  All right.

03:41:02 19     A.  -- his version.

03:41:04 20     Q.  So I just want to make sure we're all in the

03:41:07 21  same place.  Officer Staller receives an emergency

03:41:10 22  disturbance call over his patrol car's radio.

03:41:11 23     A.  I think we got it.

03:41:12 24     Q.  Okay.  You got the information that I asked you

03:41:14 25  to assume that he received over the MDT?

03:41:16  1      A.    Yes.

03:41:16  2      Q.    We're assuming that there were four children

03:41:19  3   inside the apartment?

03:41:20  4      A.    And we're assuming he knew that?

03:41:23  5      Q.    No, no, just that there were.

03:41:25  6      A.    Okay.

03:41:26  7      Q.    Well, why don't we just take that one out.

03:41:28  8   Just for the heck of it, let's just take that out, okay,

03:41:33  9   the four children.

03:41:33 10      A.    No children.

03:41:33 11      Q.    No children.  Officer Staller does not know if

03:41:35 12   the suspect is armed?

03:41:37 13      A.    I'm with you.

03:41:39 14           MR. WASHINGTON:   Objection, speculation.

03:41:42 15      Q.    (BY MR. SCHUETTE)  Officer Staller speaks with

03:41:45 16   the 9-1-1 caller who confirms to him that the suspect is

03:41:49 17   an African-American male wearing all black clothing and

03:41:53 18   wearing a wave cap, also known as a do-rag, was

03:41:58 19   repeatedly banging hard on her apartment door and kicked

03:42:01 20   her door in on a prior occasion.

03:42:05 21           MR. WASHINGTON:   Objection; calls for

03:42:08 22   speculation, assumes facts.

03:42:11 23      A.    Okay.

03:42:11 24      Q.    (BY MR. SCHUETTE)  Also, the 9-1-1 complainant

03:42:16 25   tells Officer Staller that she believes the suspect is

03:42:20  1  high on something.  Assume that the 9-1-1 caller tells

03:42:24  2  again Officer Staller that the suspect kicked in her

03:42:25  3  door on a previous occasion.  Assume that Officer

03:42:27  4  Staller perceives the 9-1-1 caller appear to be very

03:42:31  5  frightened.  Assume that the 9-1-1 caller or someone

03:42:34  6  else on the balcony points Officer Staller in the

03:42:38  7  direction where the suspect was last believed to be.

03:42:41  8  And assume that Officer Staller takes a few steps in the

03:42:45  9  direction indicated and almost immediately sees an

03:42:49 10  African-American male wearing all black clothing,

03:42:52 11  generally matching the description given.  Okay.  Let's

03:42:55 12  assume all those facts.

03:42:57 13           MR. WASHINGTON:  And I'm going to object

03:42:58 14  to the hypothetical.

03:43:03 15     Q.   (BY MR. SCHUETTE)  Is it your testimony --

03:43:04 16  would it be your testimony that it is contrary to

03:43:08 17  nationwide departmental standards for police officers

03:43:13 18  for Officer Staller to try and detain that suspect?

03:43:16 19     A.   Is it contrary to try to detain him?

03:43:20 20     Q.   Yes, to nationally accepted police standards.

03:43:23 21  Would it be contrary to those standards given that fact

03:43:26 22  scenario, Officer Staller having the information that I

03:43:29 23  just described, for Officer Staller to try to detain

03:43:32 24  that suspect?

03:43:33 25           MR. WASHINGTON:  Object to the

03:43:36  1  hypothetical.

03:43:38  2     A.   Taking nothing else into account, no, it would

03:43:43  3  not be contrary to -- I'm not exactly sure where that

03:43:50  4  standard sits.  But as I understand it -- I'll say it

03:43:54  5  that way --

03:43:55  6              MR. SCHUETTE:  All right.

03:43:56  7     A.   -- it would not be contrary to that.

03:43:58  8     Q.   (BY MR. SCHUETTE)  Is it your testimony that no

03:44:01  9  police officer could have believed that he or she was

03:44:05 10  acting within nationally accepted standards of police

03:44:09 11  procedures to detain that suspect for further

03:44:13 12  investigation?

03:44:13 13              MR. WASHINGTON:  Objection; calls for

03:44:15 14  speculation.

03:44:16 15     A.   No.

03:44:19 16     Q.   (BY MR. SCHUETTE)  In other words, it would be

03:44:24 17  your opinion that a reasonable police officer under the

03:44:30 18  fact scenario that we've just covered with the

03:44:33 19  information as I've described to you that a reasonable

03:44:37 20  police officer could believe that it would be within

03:44:40 21  nationally accepted standards of policing -- patrol

03:44:46 22  officer policing to try to detain that suspect for

03:44:50 23  further investigation?

03:44:51 24              MR. WASHINGTON:  Objection to the

03:44:54 25  hypothetical.

03:44:55  1     A.   Again, just in answer to your question, I would

03:44:59  2   agree that police officers would feel that that would be

03:45:06  3   a person they would want to at least question.

03:45:10  4     Q.   (BY MR. SCHUETTE)  And some police officers may

03:45:12  5   feel that the way to do that would be to try to engage

03:45:16  6   that suspect, right?

03:45:19  7              MR. WASHINGTON:  Objection; calls for

03:45:21  8   speculation.

03:45:21  9     A.   Engage verbally or physically?

03:45:25 10              MR. SCHUETTE:  Verbally.

03:45:31 11     Q.   (BY MR. SCHUETTE)  To try to make some contact

03:45:32 12   with that suspect?

03:45:34 13     A.   Agreed.

03:45:34 14     Q.   Now, it's your opinion that Officer Staller

03:45:38 15   should not have engaged in a foot pursuit of Mr. Allen,

03:45:43 16   right?

03:45:43 17     A.   That is still my opinion, yes.

03:45:45 18     Q.   All right.  But it's also been your opinion

03:45:47 19   that police officers who engage in foot pursuits with

03:45:54 20   potentially dangerous suspects find themselves in a

03:45:57 21   no-win situation; isn't that right?

03:45:59 22     A.   Not every time.  They can, but it's not a

03:46:01 23   hundred percent one way or the other.  It's just a

03:46:04 24   dangerous situation to be in.

03:46:06 25     Q.   Would you agree with this statement:  In

| | | |
|---|---|---|
| 04:49:28 | 1 | Q.   That is your opinion then, and it is now? |
| 04:49:36 | 2 | A.   That is correct, sir. |
| 04:49:37 | 3 | Q.   Do you agree that the standard to use when |
| 04:49:39 | 4 | judging an officer's use of force is not whether the |
| 04:49:41 | 5 | officer would have done anything differently if she |
| 04:49:46 | 6 | could have a do-over -- if he or she could do the whole |
| 04:49:51 | 7 | thing over? |
| 04:49:52 | 8 | A.   Yes. |
| 04:49:52 | 9 | Q.   As a matter of fact, isn't your opinion -- |
| 04:49:55 | 10 | didn't you state previously, "Defendant was asked |
| 04:50:01 | 11 | numerous times if he would have done anything |
| 04:50:07 | 12 | differently if he could redo the event.  Again, that is |
| 04:50:11 | 13 | not the standard to judge a use of force.  Using 20/20 |
| 04:50:14 | 14 | hindsight, anyone can look back at a use of force that |
| 04:50:17 | 15 | resulted in an injury and find a better way to have |
| 04:50:18 | 16 | handled the event."  Do you still agree with that? |
| 04:50:21 | 17 | A.   Yes.  But there can be a place where asking |
| 04:50:28 | 18 | those questions would be relevant, but not in the |
| 04:50:31 | 19 | analysis of the force option -- or the force used. |
| 04:50:34 | 20 | Q.   So you would agree that Officer Staller's |
| 04:50:36 | 21 | decision to go Code 3, lights and siren, in response to |
| 04:50:39 | 22 | Mandria Kelly's 9-1-1 call is not relevant to whether |
| 04:50:42 | 23 | his later decision to use force was proper? |
| 04:50:46 | 24 | MR. WASHINGTON:  Objection, vague. |
| 04:50:48 | 25 | A.   There may be some relevance, but I would not be |

04:50:50  1  able to put the two together.  So I don't know what it

04:50:55  2  would be.

04:50:55  3      Q.   Well, let me put it to you in a different way.

04:51:00  4  If Clinton Allen leapt over the rail and attacked

04:51:05  5  Officer Staller, does the fact that some minutes

04:51:10  6  previously Officer Staller went Code 3 to get to the

04:51:14  7  scene have anything to do with the propriety of his

04:51:17  8  decision to use a Taser against Mr. Allen?

04:51:19  9              MR. WASHINGTON:  Objection; assumes facts

04:51:22 10  not in evidence, objection to the hypothetical.

04:51:27 11      A.   Actually we're -- I mean, for clarification,

04:51:29 12  we're not talking hypothetical here.  We're talking this

04:51:32 13  event.

04:51:33 14              MR. SCHUETTE:  This event.

04:51:35 15      A.   And give me the last line of the question

04:51:43 16  again.  I'm not sure now whether I need a yes or a no

04:51:46 17  answer here.

04:51:47 18      Q.   (BY MR. SCHUETTE) All right.  Under the

04:51:49 19  hypothetical we've discussed --

04:51:52 20      A.   Okay.  I'm sorry.  Hypothetical or this event?

04:51:56 21      Q.   This event.

04:51:56 22      A.   Okay.

04:51:57 23      Q.   This event.  Under the facts which I have asked

04:52:00 24  you to assume are true, which are Mr. Allen leapt over

04:52:04 25  the rail to physically engage with Officer Staller,

04:52:07  1  okay, and Officer Staller responded by trying to use his

04:52:13  2  Taser -- you've already testified that that would be a

04:52:16  3  reasonable response to that action, right?

04:52:18  4              MR. WASHINGTON:  Objection; misstates the

04:52:20  5  testimony, assumes facts not in evidence, assumes --

04:52:25  6  objection to the hypothetical.

04:52:27  7      A.   I guess where I'm getting -- having difficulty

04:52:30  8  is, we're jumping back and forth between hypothetical

04:52:33  9  and this event.  I'm not trying to be difficult.

04:52:38 10              MR. SCHUETTE:  I understand.

04:52:39 11      A.   I'm just not quite sure.  Start over --

04:52:43 12              MR. SCHUETTE:  Okay.

04:52:44 13      A.   -- and I'll try.

04:52:48 14      Q.   (BY MR. SCHUETTE)  Given your acknowledgment

04:52:53 15  that what we need to be looking at in evaluating the

04:52:57 16  propriety of Officer Staller's use of force is the

04:53:02 17  situation that he faced at the time he used the force,

04:53:08 18  do you agree that whether Officer Staller used sirens

04:53:13 19  and lights to get there in the first place is not

04:53:16 20  relevant to evaluating the reasonableness of a decision

04:53:20 21  to use a Taser to defend against Mr. Allen's physical

04:53:27 22  attack?

04:53:28 23              MR. WASHINGTON:  Objection; assumes facts

04:53:30 24  not in evidence.

04:53:34 25      A.   I would agree that I see no direct connection

```
04:53:38  1  between him running Code 3 and his decision to use a
04:53:44  2  Taser at the time that he did.
04:53:46  3       Q.   (BY MR. SCHUETTE)  Let me put it to you -- the
04:53:48  4  question another way:  If Officer Staller had not gone
04:53:52  5  Code 3 but events nonetheless played out the way Officer
04:53:56  6  Staller said that they did, would the decision to use
04:53:59  7  the Taser be any more or less reasonable?
04:54:04  8       A.   No.
04:54:04  9       Q.   Similarly, if the situation played out in the
04:54:08 10  way that Officer Staller says it did with respect to
04:54:12 11  Mr. Allen choking him to the point of losing
04:54:16 12  consciousness, would Officer Staller's decision to use
04:54:20 13  deadly force be any more or less reasonable because of
04:54:24 14  the use of the siren previously?
04:54:34 15       A.   No.
04:54:34 16       Q.   Similarly, you criticized in your report
04:54:37 17  Officer Staller's radio procedures, right?
04:54:41 18       A.   I did.
04:54:41 19       Q.   Okay.  If events occurred in the manner that
04:54:45 20  Officer Staller said that they did, would Officer
04:54:48 21  Staller's decision to use a Taser in response to
04:54:51 22  Mr. Allen's physical attack be any more or less
04:54:56 23  reasonable based on what radio procedures he used?
04:55:06 24            MR. WASHINGTON:  Objection, vague.
04:55:08 25       A.   No.
```

04:55:22  1      Q.   (BY MR. SCHUETTE)  Same question, except with

04:55:28  2  respect to the use of deadly force:  If Officer

04:55:31  3  Staller's recitation of events is what occurred in that

04:55:39  4  he was being choked by Mr. Allen to the point of

04:55:43  5  unconsciousness, would Officer Staller's decision to use

04:55:44  6  deadly force in response to that action by Mr. Allen be

04:55:47  7  any more or less reasonable because of the radio

04:55:50  8  procedures that Officer Staller used?

04:55:53  9            MR. WASHINGTON:  Objection, vague; assumes

04:55:55 10  facts not in evidence.

04:55:56 11      A.   No.  If it got to that point, the fact that he

04:55:59 12  failed to get on the radio and let people know what's

04:56:02 13  going on and where he was, although that may have

04:56:04 14  changed the outcome, if it didn't change the outcome and

04:56:08 15  he was being choked, then his earlier improper use of

04:56:12 16  the radio and what -- however you want to define it

04:56:15 17  wouldn't change that.

04:56:17 18      Q.   (BY MR. SCHUETTE)  Are you aware of any

04:56:22 19  standard for police officers that requires an officer to

04:56:28 20  act with perfection?

04:56:30 21      A.   No.

04:56:31 22      Q.   And that is particularly true, isn't it, with

04:56:38 23  police where officers are asked to make immediate

04:56:41 24  decisions based on circumstances that are tense,

04:56:45 25  uncertain and rapidly evolving?

05:10:31  1  potential encounter.  It could have come from an

05:10:34  2  encounter.  It could have come from other sources.

05:11:07  3      Q.   (BY MR. SCHUETTE)  You've gone through Officer

05:11:09  4  Staller's training records, have you not?

05:11:11  5      A.   Yes, sir.  I did review them.

05:11:13  6      Q.   Have you gone through the training records of

05:11:15  7  any other officer?

05:11:18  8      A.   Ever or in this case?

05:11:19  9      Q.   In this case.

05:11:20  10      A.   I don't recall reviewing anyone else's training

05:11:24  11  records in this case.

05:11:24  12      Q.   Is it your testimony that you are able to

05:11:36  13  extrapolate the sufficiency of a police department's

05:11:43  14  training program from the training received by one

05:11:46  15  officer?

05:11:46  16      A.   No.

05:11:46  17      Q.   Is it your opinion that you are able to

05:11:49  18  reliably extrapolate the sufficiency of a police

05:11:54  19  department's training program based upon mistakes or

05:11:58  20  errors made by one officer?

05:11:59  21      A.   No.

05:12:00  22      Q.   I see in your report Page 11, Paragraph 16.

05:12:31  23      A.   I'm there.

05:12:31  24      Q.   You say fourth line from the bottom, "This

05:12:36  25  gasket has nothing to do with the connection and was

051

05:12:40  1  added to the design to help keep dirt and debris out of

05:12:44  2  the CEW."  Do you see that?

05:12:45  3      A.    I do.

05:12:46  4      Q.    First, what is a CEW?

05:12:48  5      A.    Conducted electrical weapon, also known as a

05:12:52  6  Taser.

05:12:53  7      Q.    Is it also sometimes referred to as a conducted

05:12:55  8  energy weapon?

05:12:56  9      A.    It can be.

05:12:57 10      Q.    And it's your testimony that that gasket has

05:13:01 11  absolutely nothing to do with maintaining the connection

05:13:04 12  between the DPM and the Taser hand unit itself?

05:13:12 13      A.    It is.

05:13:32 14      Q.    You opine that there are no documents to

05:13:35 15  indicate that the City of Dallas and the Dallas Police

05:13:38 16  Department provided Staller with adequate CEW training.

05:13:40 17  Do you see that on Page 12, Paragraph 16?

05:13:48 18      A.    Yes.

05:13:49 19      Q.    And as you just testified, you are not able to

05:13:54 20  extrapolate the sufficiency of CEW training based on the

05:14:02 21  training provided to Staller?

05:14:05 22      A.    No.  In order to know for sure that their

05:14:08 23  entire program was inadequate, I would have to see the

05:14:12 24  training program and the results for multiple officers,

05:14:15 25  not just one officer.

05:24:05  1      Q.    And where do you list the police officers?

05:24:08  2      A.    They're not there, and I couldn't supply them

05:24:12  3  to you if you asked me to do so.

05:24:13  4      Q.    So discussions with people who you have not

05:24:16  5  listed in your report and you cannot name for this jury

05:24:20  6  today?

05:24:20  7      A.    That's correct.

05:24:20  8      Q.    On Paragraph 26, Page 16, fifth line from the

05:24:47  9  bottom starts:  "The City of Dallas, through the Dallas

05:24:56 10  Police Department," you say, "failed in its duty to

05:24:57 11  properly train and supervise Staller, and exhibited a

05:25:03 12  deliberate indifference for the rights and well-being of

         13  Clinton Allen by allowing a gross deviation from the

05:25:08 14  generally" -- sorry.  Let me start that over for the

05:25:10 15  court reporter.

05:25:10 16           "The City of Dallas, through the Dallas

05:25:13 17  Police Department, failed in its duty to properly train

05:25:16 18  and supervise Staller, and exhibited deliberate

05:25:20 19  indifference for the rights and well-being of Clinton

05:25:22 20  Allen by allowing a gross deviation from the generally

05:25:26 21  accepted standards of practices and procedures."

05:25:34 22           Who in the Dallas Police Department do you

05:25:38 23  say failed in its duty to properly train and supervise

05:25:41 24  Staller?

05:25:41 25      A.    Well, ultimately I would have to assume that

05:25:44  1  that responsibility goes all the way to the top to the

05:25:47  2  police chief.  I'm sure it was -- he was not personally

05:25:50  3  involved in training his officers, but he was in charge

05:25:54  4  of seeing to it that they got the training that they

05:25:57  5  needed.

05:25:57  6      Q.   What information do you have that the chief of

05:26:01  7  police was aware of a specific deficiency in the

05:26:05  8  training program of Dallas police officers and knowing

05:26:10  9  that deficiency also had linked in his mind a risk of

05:26:19 10  the specific harm that happened to Mr. Allen and was

05:26:25 11  deliberately indifferent to that risk?

05:26:28 12              MR. WASHINGTON:  Objection to compound

05:26:30 13  question; misstates the evidence.  The document speaks

05:26:34 14  for itself.

05:26:39 15      A.   So in other cases involving the Dallas Police

05:26:44 16  Department that I have looked at, training and

05:26:47 17  supervision of individuals who have been accused of

05:26:50 18  using excessive force, and the reaction by the

05:26:54 19  department to those complaints gave me a foundation to

05:27:01 20  strongly suspect that this was not just a single officer

05:27:07 21  who appeared not to have adequate training, but this was

05:27:11 22  an ongoing issue.

05:27:12 23              With respect specifically to the Taser

05:27:14 24  program, again, one of the worse in any large city with

05:27:18 25  that -- within the State of Texas at least, there was

```
      1                    FURTHER EXAMINATION

      2  BY MR. SCHUETTE:

06:43:19  3     Q.   Are soot nitrites and vaporous lead components

      4  of gunpowder residue?

      5     A.   Are they?

06:43:23  6     Q.   Yes.

06:43:23  7     A.   Yes.

06:43:24  8              MR. SCHUETTE:   Thank you.

06:43:24  9              MR. WASHINGTON:   One last question for

     10  you.

     11

     12                    FURTHER EXAMINATION

     13  BY MR. WASHINGTON:

06:43:26 14     Q.   Based on the plastic of the jacket -- and I

06:43:31 15  want to say plastic -- if an officer would have fired

06:43:35 16  nine shots that close to that jacket, would there have

06:43:39 17  been some significant burning to that jacket?

06:43:40 18     A.   Yes.

06:43:41 19              MR. SCHUETTE:   Objection; calls for

06:43:44 20  speculation, outside the expert's knowledge, not

06:43:46 21  contained in the expert report.

06:43:48 22     A.   Yes.

06:43:49 23     Q.   (BY MR. WASHINGTON)   And is that based on your

06:43:51 24  40-plus years of experience?

06:43:53 25     A.   Yes.
```

245

```
1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF TEXAS
2                         DALLAS DIVISION

3    COLLETTE FLANAGAN,              *
     Individually and on behalf of  *
4    the Estate of CLINTON ALLEN,    *  CIVIL ACTION NO.
     Deceased, and RONDERALINE S.    *
5    ALLEN, Individually,            *    3:13-CV-4231-M
                   Plaintiffs,       *
6                                    *
     v.                              *
7                                    *
     THE CITY OF DALLAS, TEXAS and   *
8    CLARK STALLER,                  *
                   Defendants.       *
9
                      REPORTER'S CERTIFICATION
10                 DEPOSITION OF JERRY R. STATON
                       SEPTEMBER 22, 2016
11

12          I, LYDIA L. EDWARDS, Certified Shorthand Reporter,

13   hereby certify to the following:

14          That the witness, JERRY R. STATON, was duly

15   sworn by the officer and that the transcript of the oral

16   deposition is a true record of the testimony given by

17   the witness;

18          That the deposition transcript was submitted on

19   _____October 4____, _2016_, to the witness or to the

20   attorney for the witness for examination, signature and

21   return to me by _____November 7_____, _2016_;

22          That the amount of time used by each party at the

23   deposition is as follows:

24          Jason G. Schuette - (04:15)

25          Daryl K. Washington - (01:06)
```

056

246

```
 1         That pursuant to information given to the deposition
 2    officer at the time said testimony was taken, the
 3    following includes counsel for all parties of record:
 4         Mr. Daryl K. Washington – attorney for Plaintiffs
           Mr. Jason G. Schuette – attorney for Defendants
 5             THE CITY OF DALLAS, TEXAS and CLARK STALLER
 6         I further certify that I am neither counsel for,
 7    related to, nor employed by any of the parties or
 8    attorneys in the action in which this proceeding was
 9    taken, and further that I am not financially or
10    otherwise interested in the outcome of the action.
11         Certified to by me this ___4th___ day of
12    __OCTOBER_____, _2016_.
13
14
15         _Lydia L Edmunds_____
16    LYDIA L. EDWARDS
      Certification No. 2567
17    Expiration Date:  12-31-16
      CONTINENTAL COURT REPORTERS, INC.
18    Firm Registration No. 350
      504 Lavaca Street, Suite 980
19    Austin, Texas  78701
      (512) 479-7771
20
21
22
23
24
25    JRS/AL
```

057

1               FURTHER CERTIFICATION

2        The original deposition ~~was~~ (was not) returned to the

3 deposition officer on November 7, 2016

4    If returned, the attached Changes and Signature page

5 contains any changes and the reasons therefor;

6    If returned, the original deposition was delivered

7 to ___Jason G. Schuette___, Custodial

8 Attorney;

9    That $ ___N/A___ is the deposition officer's charges

10 to the ___Defendant___ for preparing the original

11 deposition transcript and any copies of exhibits;

12    That the deposition was delivered in accordance with

13 Rule 30(f), and that a copy of this certificate was

14 served on all parties shown herein.

15    Certified to by me this _21_ day of _November_

16 _2016_.

17

18

19 _Lydia L Edwards_

20 LYDIA L. EDWARDS
   Certification No. 2567

21    Expiration Date: 12-31-16
   CONTINENTAL COURT REPORTERS, INC.

22    Firm Registration No. 350
   504 Lavaca Street, Suite 980

23    Austin, Texas 78701
   (512) 479-7771

24

25 JRS/AL

*(seal: CERTIFIED SHORTHAND REPORTER · TEXAS)*